**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| EVRIDIKI NAVIGATION, INC., et al. | * |
| Plaintiffs | * |
| v. | *  Civil Action No. JKB-12-CV-1382 |
| THE SANKO STEAMSHIP CO., LTD. | * |
| Defendant | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**JOINT MEMORANDUM OF LAW**
**IN RESPONSE TO COURT'S ORDER DATED JUNE 22, 2012**

Now comes Intervenor Western Bulk Carriers AS ("WBC"), Defendant Sanko Steamship Co., Ltd. ("Sanko"), and Intervenor The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") (collectively, the "Vessel Interests"), by and through undersigned counsel and respectfully submit this brief in response to the Court's Order dated June 22, 2012 (Doc. #97).

**INTRODUCTION**

An evidentiary hearing was held before Chief Magistrate Judge Grimm from June 21-22, 2012, and at the conclusion of that process Judge Grimm issued his findings of fact, which determined, among other things, that(1) the value of the SANKO MINERAL ("Vessel") at a straight sale would be in the range of $19 million - $19.5 million; (2) the value of the Vessel at a judicial sale would be in the range of $16 million - $17 million; and (3) the range of all asserted lien claims against the Vessel is **$33,474,461.00** to **$36,856,345.40.**  *See* Judge Grimm's Chart of Factual Findings (Doc. #95).

This Memorandum of Law will address the following issues: (A) Whether the Court possesses equitable authority to vacate a valid Rule B attachment on grounds of futility; (B)

Whether the BTMU's foreign preferred ship's mortgage against the M/V SANKO MINERAL

should be "equitably subordinated" to the *in personam* claims advanced by the Liquimar

Plaintiffs and Knightsbridge (collectively, "Attaching Plaintiffs") against Sanko; and (C)

Whether the choice of law provisions contained in WBC's charter party with Sanko prevent it

from enforcing a maritime lien in this case.

## ARGUMENT

I.   **THE ATTACHING PLAINTIFFS' RULE B ATTACHMENTS SHOULD
     BE VACATED AS FUTILE BECAUSE THE *AQUA STOLI* DECISION
     PLACES NO LIMITATION ON THE COURT'S EQUITABLE DISCRETION**

There is no question that this Court sitting in admiralty has discretion to fashion equitable

relief in the Rule B attachment context because it is clear that district courts sitting in admiralty

may exercise equitable discretion. *Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) ("Equity is no

stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable

relief."); *Greenwich Marine, Inc. v. Alexandra*, 339 F.2d 901, 905 (2d Cir. 1965) ("The inherent

power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound

discretion of the district judge sitting as an admiralty judge . . . ."). These very principles were

discussed in this Court in the case of *Techem Chemical Co. v. M/T Choyo Maru*, 416 F.Supp.

960 (D.Md. 1976):

> The Advisory Committee Note to Supplemental Rule A echoes statements in
> these [referring to *Vaughan* and *Greenwich Marine*] and other admiralty
> decisions. That Note states in pertinent part that these Rules are not to be
> construed as limiting or impairing the traditional power of a district court,
> exercising the admiralty and maritime jurisdiction, to adapt its procedures and its
> remedies in the individual case, consistently with these rules, to secure the just,
> speedy, and inexpensive determination of every action. (See *Swift & Co. Packers
> v. Compania Colombiana Del Caribe, S/A*, 339 U.S. 684, 94 L. Ed. 1206, 70 S.
> Ct. 861 (1950); Rule 1). * * *"

*Techem Chemical*, 416 F.Supp. at 970-71.  *See also Triton Marine Fuels, Ltd. v. M/V Pac. Chukotka*, 671 F.Supp.2d 753 (D.Md. 2009)("[a] court of the admiralty has powers akin to those of a court of equity**,** and should not be hampered in its efforts to reach substantial justice by inexorable rules invoked by the claimant."); *The Fairisle*, 76 F.Supp. 27, 33 (D.Md. 1947)(quoting *The Minnetonka*, 146 F. 509, 515 (2d Cir. 1906)); *Hawkspere Shipping Co. v. 65 Bundles of Secondary Aluminum*, 178 F.Supp.2d 486 (D.Md. 2001)(same).

Turning to the question of whether, as Knightsbridge asserts, the decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd*., 460 F.3d 434, 444 (2d Cir. 2006) presents a bar to this Court vacating the attachments herein as futile, it is clear that it does not.  In *Aqua Stoli,* the Second Circuit Court of Appeals held that district courts have limited equitable discretion to vacate maritime attachments that comply with Rule B's basic requirements.  In considering the scope of a district court's discretion to vacate a Rule B attachment, the Second Circuit made clear that the exact scope of such discretion was not before the court.  While the *Aqua Stoli* Court addressed several particular circumstances justifying vacatur, it made clear that the circumstances it considered were by no means an exhaustive list:

> While, as we have noted, ***the exact scope of a district court's vacatur power is not before us***, we believe that a district court *may* vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Id*. at 445 (emphasis added).[1]

---

[1] Thus, Knightsbridge's contention that "the doctrine of equitable vacatur must be used sparingly and that district courts should not weigh the various equities of the underlying case at [the] initial hearing" is premised on a false reading of *Aqua Stoli*.  (Doc. #62 at 17).  Moreover, *Aqua Stoli* did not render moot the very language of Rule E(4)(f) that a party can attack "the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed. R. Civ. P. Supp. Rule E(4)(f), advisory committee's note.

That *Aqua Stoli* does <u>not</u> stand for the proposition that a district court's discretion to vacate is constrained to the particular circumstances discussed therein, the decision was explained in *Chiquita Int'l Ltd. v. MV Bosse*, 518 F.Supp.2d 598 (S.D.N.Y. 2007).  In *Chiquita*, although the court determined that the plaintiff had met Rule B's technical requirements it nevertheless vacated the attachment because the plaintiff's "seeking of an order of attachment … was an improper practice and showed a want of equity…"  *See Chiquita*, 518 F.Supp.2d at 599; *see also McDermott Gulf Operating Co. v. Con-Dive, LLC*, 2009 WL 1855929, *9 (S.D.Ala. June 29, 2009), *aff'd*, 371 Fed.Appx. 67 (11th Cir. 2010).

*Chiquita* noted that "in Aqua Stoli Shipping Ltd., '[a]lthough the precise boundaries of a district's vacatur power' were not before the court, the Second Circuit described circumstances that would justify vacatur of an attachment," 518 F.Supp.2d at 598, and further observed that "[T]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge." *Id. citing Greenwich Marine,* 339 F.2d at 905.  Hence, it is very clear that that the circumstances addressed in *Aqua Stoli* are not the sole circumstances in which a district court may vacate a maritime attachment.

*Aqua Stoli* simply did not announce a bright line test as urged by Knightsbridge.  *See Hong Kong City-Dragon Shipping Co. v. Benxi Iron & Steel (Group) Int'l Econ. & Trading Co.*, 2009 WL 2526219, *1-2 (S.D.N.Y. Aug. 19, 2009) (court extended its equitable power to other situations beyond those set out in *Aqua Stoli*).

Thus, contrary to Knightsbridge's argument, equitable vacatur is not limited to the three factual scenarios considered in *Aqua Stoli*.  *See, e.g., McDermott Gulf Operating Co.*, *supra*, 371 Fed.Appx. 67, 70 (11th Cir. 2010) (holding that district court did not err in concluding the totality of the facts warranted an equitable exception to a general rule upholding maritime

attachments).   Rather, attachments may be dismissed in other instances including where an attachment of a defendant's property would be "worthless" or "futile" in terms of enforcement. *See Pilot Enters. v. Brodosplit, Inc.*, 391 Fed.Appx. 923, 924-925 (2d Cir. 2010)(upholding vacatur of a Rule B attachment because the attached property was "worthless" to the plaintiff).

The doctrine of futility warrants vacatur of the Rule B attachments in this case.   The monetary value of the custodial costs and lien claims of WBC, BTMU, and the cargo parties are reasonably likely to: (a) be found to be legitimate maritime lien claims as a matter of fact and law; (b) exhaust the value of the fund created by sale of the Vessel at judicial auction; and (c) prime their Rule B claims in terms of lien priority.   For these reasons the Court should exercise its equitable discretion to vacate Rule B attachments against the Vessel as futile, or worthless. *See Williamson v. Recovery Partnership, LLC*, 542 F.3d 43 (2d Cir. 2008) ("[E]ven when a plaintiff meets the procedural requirements for obtaining a maritime attachment, the district court may nonetheless vacate such an attachment for equitable reasons").

## II.    EQUITABLE SUBORDINATION HAS NO APPLICATION IN THIS CASE

Equitable subordination is an "extraordinary remedy" arising from "egregious misconduct" that must be "proven with particularity."   Before this Court, the Attaching Plaintiffs have made such an accusation against BTMU in a transparent and desperate attempt to avoid the vacating of their attachments, yet the allegations (as can be gleaned from the record) are almost casual, border on the cavalier, and are wholly unsupported by the evidence.

The Attaching Plaintiffs have two "theories" for this allegation.   First, by way of a non-judicial re-structuring process in Japan (the ADR), a "cabal" consisting of BTMU and a number of other banks are in "control" of Sanko and required it to defer certain hire payments to

shipowning creditors; and second, since BTMU "knew" Sanko was "insolvent," BTMU "allowed" Sanko to run up debts on the Vessel. Neither theory has any merit.[2]

Courts exercising admiralty jurisdiction may, in limited circumstances, apply the doctrine of equitable subordination to resolve priority disputes regarding ship mortgages. *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F.2d 561, 565 (5th Cir. 1986); *see also Transmontaigne Prod. Servs. v. M/V Wilbur R. Clark*, 2010 WL 1267302 at *7 (S.D.Ala. Mar. 29, 2010). Originally developed in bankruptcy law, the doctrine of equitable subordination is used to avoid the inequity of a claim brought against a bankruptcy estate that would produce unfair results. It allows for subordination of claims when the claimant has engaged in some type of "inequitable conduct" which has conferred an unfair advantage on the claimant or resulted in injury to creditors. *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).

The proponent of equitable subordination has the burden of proof. *In re Racing Servs., Inc.*, 386 B.R. 751, 755 (8th Cir. 2008). Where a party deals with a debtor as an arms' length creditor, a secured loan "will not be equitably subordinated unless egregious conduct on behalf of the creditor can be proven with particularity." *In re Auto Specialties Mfg. Co.*, 153 B.R. 457, 478 (Bankr. W.D.Mich.1993) (*citing Zimmerman v. Cent. Penn. Nat. Bank (In re Ludwig Honold Mfg. Co.*), 46 B.R. 125, 128 (Bankr. E.D.Pa. 1985)). "Equitable subordination in such cases is 'an extraordinary remedy.'" *Id.* (citation omitted).

Equitable subordination cannot be based on mere negligence or indifference, but instead a mortgage may generally only be subordinated if its holder is guilty of some misconduct as

---

[2] Perhaps the Attaching Plaintiffs will request the Court to allow further discovery, but, if so, the request should be denied. At the evidentiary hearing, the Attaching Plaintiffs did not introduce any exhibits or testimony on the issue. Conversely, BTMU went to extraordinary lengths to respond to KTL's discovery requests (Tr. 342:12 - 343: 4 (Ex. K); Tr. 369:18 - 370: 16) including bringing witnesses from Japan on very short notice. Further, Sanko generally appeared in this matter on May 14, 2012. (Doc. #8). However, at no point did Attaching Plaintiffs take even the basic step of seeking the deposition of a Sanko representative.

illustrated in *Custom Fuel Services* and *Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel*, 841 F.2d

259, 263 (9th Cir. 1988) (bank engaged in inequitable conduct:  no consideration, gratuitous

security interest obtained, security interest on vessel extended for additional five years).  It is a

measure used only sparingly.[3]

For non-insider creditors,[4] such acts must encompass a degree of misconduct '"variously

described as 'very substantial' misconduct involving 'moral turpitude' or some breach of duty or

some misrepresentation whereby other creditors were deceived to their damage' or as gross

misconduct amounting to fraud, overreaching or spoliation."  *In re M. Paolella & Sons, Inc.*, 161

B.R. 107, 119 (E.D.Pa. 1993), quoting *In re Osborne*, 42 B.R. 988, 996 (W.D.Wis. 1984).[5]

The three conditions necessary to justify equitable subordination in the context of a ship

mortgage are "(i) the claimant must have engaged in some type of inequitable conduct. (ii) the

misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair

advantage on the claimant. (iii) equitable subordination of the claim must not be inconsistent

---

[3] There are numerous examples of cases in which equitable subordination has been alleged, but the court has declined to subordinate the mortgage, finding the absence of inequitable conduct.  *See, e.g., Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1233, 1238-39 (11th Cir. 2006) (no indication that mortgage was a sham or that bank had engaged in inequitable conduct as mere postponement of declaration of default of loan was insufficient to equitably subordinate the mortgage);  *United States v. Trident Crusader*, 366 F.3d 391, 395-96 (5th Cir. 2004) (where court found no bad faith nor fraud or other inequitable conduct, then no basis to warrant equitable subordination of mortgage).

[4] The fact that BTMU holds 4.3% of Sanko's shares (BTMU Ex. 14) does not make BTMU an "insider" of Sanko, certainly as that term is understood and applied (a director, officer, general partner or other person in control of a debtor, *see* 11 U.S.C. §101(31)).  BTMU's Nobuo Katsumata explained the circumstances of the acquisition of the shares as well as the fact that BTMU is not involved in Sanko's management.  (Tr. 256:7 - 257:23).

[5] The unrebutted evidence of record establishes that the 2008 ship finance transaction between BTMU and Sanko was a routine ship financing.  As detailed in the testimony of BTMU's Head of Ship Finance, Hideki Horibe, the loan and related mortgage was supported by adequate consideration and was documented in the customary fashion. (Tr. 209:20 - 237:11; BTMU Exs. 1A, 1B, 2, 3, 5, 6, 8-10, 12-14 and 17-18).  This situation is entirely consistent with BTMU's status as a leading ship finance bank that currently finances about 500 vessels for 400 different shipping owning companies.  (Tr. 206:10 - 207:13).  Further, as BTMU's mortgage has been found to be a valid, preferred mortgage (Tr. 248:11 -14), "fraud" and "illegality" as to the mortgage is no longer in issue.  *See United States v. Pride of Texas*, 964 F.Supp. 986, 991 (E.D.Va. 1994).

with [statutory provisions]."[6]  *Custom Fuel Services, Inc.*, 805 F.2d at 566 (citations omitted). But before reaching these three conditions, there "must be a showing that the [superior] claimant is in a position of control over the debtor." *Id.*

Equitable subordination has been generally limited to cases where a creditor is an insider or manager of the debtor, or where a creditor has exercised substantial control over the debtor. *Branch Banking & Trust Co. v. M/Y Beowulf*, 2012 WL 464002 at *9 (S.D.Fla. 2012).  In *Custom Fuel*, the record clearly showed that the bank whose preferred mortgage was at issue dominated the borrower by way of control of all its stock and the "The Bank caused the [borrower's] directors to approve the "purchase" of the vessel and grant the Bank a mortgage in return."  805 F.2d at 566.

Conversely, it has been held that just because outside entities are involved in a borrower's business, that does not equate to "control."  In *Pride of Texas*, 964 F.Supp. at 991, the mortgagee was the Maritime Administration ("MARAD").  MARAD had certain rights under the loan agreement as to how the borrower expended certain reserve funds.  Where the MARAD simply exercised its ability under the loan agreement to prevent imprudent use of the borrower's reserve funds, it was found not to be in control of the borrower.  *Id.*  Similarly, a limit on capital expenditures in a loan agreement was not evidence of domination over the debtor, as it protected not only the creditor at issue but also other creditors including the respondents.  *Transmontaigne Prod. Servs.*, 2010 WL 1267302 at *8.

---

[6] The statutory inconsistency would be in fact to subordinate BTMU's mortgage. *See Pride of Texas*, 964 F.Supp. at 993 ("It is clear to this court that subordinating the preferred mortgage would be inconsistent with [46 U.S.C. § 31326].").

It appears that the Attaching Plaintiffs advance the theory that through the ADR process,[7] BTMU (and presumably the other participating banks) "control" Sanko to the extent that it was the banks' decision to defer hire payments to shipowners (including Attaching Plaintiffs), and that it was not the decision of Sanko. The evidence of record is entirely to the contrary.[8]

During the evidentiary hearing, Attaching Plaintiffs quoted (Tr. 348:9-25) from a treatise, apparently to advance a separate theory of equitable subordination. The treatise was Grant Gilmore & Charles L. Black, The Law of Admiralty (2d ed. 1975) § 9-83 at 786.[9] The point made in the venerable Gilmore and Black treatise is inapposite to this case. In the scenario referred to in the treatise, the owner-mortgagor was "hopelessly insolvent." *Id*. at 785. Essentially, the writers have asserted that it would be inequitable for the mortgagee to prime the maritime lien claims of suppliers who furnished goods and services to the vessel when the mortgagee "knows" its borrower is insolvent and "will necessarily run up large bills for supplies and repairs which he will be unable to pay in the ordinary course of business." *Id*. at 786. Even

---

[7] It is clear from the testimony that the ADR process is an effort to allow Sanko some time to address its financial situation. (Tr. 253:9 - 255:17). However, nothing in the ADR process precludes BTMU from foreclosing on its mortgage if need be. (Tr. 255:18 -23). A temporary suspension of Sanko's obligations does not justify the application of the equitable subordination doctrine. *See The West of England Ship Owners Mutual Protection and Indemnity Association (Luxembourg) v. Patriarch S.S. Co.*, 491 F.Supp. 539, 545 (D.Mass. 1980)("The mere failure of the Bank to foreclose on a ship mortgage does not deprive the mortgagee of its preferred status.").

[8] The first meeting of the ADR committee was held on March 29, 2012. (Tr. 260:20 - 261:1). Sanko did not even commence the ADR process until March 15, 2012. (Jagoe Decl. ¶ 7, Doc. #50-1 ¶ 4). Tellingly, well before then, Sanko communicated with the various shipowners about Sanko's need to defer part of the hire payments. In this regard, Sanko's letter dated March 9, 2012 (submitted by KTL: Doc. #16-2) is key as it explains in detail Sanko's intention concerning the deferred payments. The March 9th letter coupled with the more specific notice letters (submitted by the Liquimar Plaintiffs: Docs. ## 1-4, 1-6, 1-10, 1-13 and 1-15) all clearly establish that the action was Sanko's alone. Finally, the unrebutted testimony of BTMU's representative to the ADR committee, Nobuo Katsumata, was clear: the banks had nothing to do with Sanko's decisions about dealing with the shipowning creditors. (Tr. 262:9-20; 264: 14-22). In short, there is <u>no</u> credible evidence to conclude that BTMU had any "control" over Sanko, let alone the level of control to justify the extraordinary remedy of equitable subordination.

[9] For ease of reference, a copy of this section of the treatise is attached hereto as Exhibit A.

if the Gilmore and Black analysis (which cites no precedent in support)[10] has some merit, the concept has absolutely no application here.

Simply put, while Sanko is certainly facing serious financial challenges, it is not "hopelessly insolvent." For example, although Sanko has requested its shipowning creditors to accept deferral of part of the charter hire due, the Attaching Plaintiffs have accepted substantial sums from Sanko since the March 9, 2012 letter:  by the Liquimar Plaintiffs $3,225,894.46 (Doc. ## 1-3, 1-5, 1-8, 1-9, 1-12, 14-1 and 49-4) and KTL $596,366.00 (Doc. # 16-6).[11]

The Gilmore and Black concept is driven by the fact that the mortgagee "benefited" by the goods and services provided to the mortgaged vessel by the junior lienholders.  That is a crucial fact here as the Attaching Plaintiffs have provided neither goods nor services to the Vessel.  Thus, even if the Gilmore and Black concept is given any credence, the Attaching Plaintiffs cannot assert that their unrelated Rule B attachment claims should have priority over the BTMU mortgage since neither Attaching Plaintiff has conferred any "benefit" on the Vessel.

In summary, the Attaching Plaintiffs have not met their burden of proof and their theories have no support in the record or are completely inapposite to the facts of this case.

## III.   <u>WBC'S LIEN CLAIM IS VALID</u>

WBC has asserted a claim in this proceeding against Sanko for breach of a maritime contract of charter.  WBC claims, *inter alia*, that Sanko breached Clause 46 of the Sanko-WBC charter party for the Vessel by failing to arrange for transshipment of the cargo on the vessel to New Orleans and Houston following the expiration of 5 days after the vessel was attached in

---

[10] It is ironic that the case on which the treatise relies for the factual scenario does not support the Gilmore and Black concept.  *The Favorite*, 120 F.2d 899 (2d Cir. 1941).

[11]  Since payments to KTL are listed only through April 10, 2012, one can only surmise that KTL has received additional payments from Sanko since then.

Baltimore. (Tr. 95:15 – 100:5). As damages on the lien claim, WBC claims the costs of discharging the cargo and transshipping it to New Orleans and Houston (Tr. 99:20 – 100:5); WBC Complaint in Intervention (Doc. #21).

As specifically set forth in the addendum to the charter party, disputes between WBC and Sanko arising thereunder are governed by U.S. federal maritime law. (Tr. 100:16 – 102:5; WBC Ex. 1, Addendum No. 1). At all material times, the charter party contemplated that the Vessel would sail laden with cargo from the Mediterranean Sea to three ports in the United States -- Baltimore, New Orleans, and Houston. (Tr. 102:14-23; Ex. 1). Moreover, the charter party has many additional aspects involving (and invoking) U.S. law. For example, WBC was required to make charter party hire payments to Sanko in New York. (Tr. 102:24 -103:25; Ex. 1, Clause 5). The charter contract further provides for the incorporation of a USA clause paramount mandating that United States law would govern all bills of lading issued for cargo carried during the voyage to the United States. (*See* Clause 54, Exhibit 2. Tr. 104:4 – 105:25; Ex. 1, Clause 54 and Ex. 6). Sanko and WBC also agreed in the charter party that the Vessel would comply with United States oil pollution laws (Tr. 106:1-14), United States laws regarding issuance of bill of lading identifier codes (Tr. 106:15 – 107:6), United States laws on maritime security (Tr. 107:7-14), and United States laws regarding submission of advanced manifests to United States Customs (Tr. 107:15 – 108:5).

In light of the numerous clauses of the Sanko – WBC charter party, Attaching Plaintiffs' contention that there was something nefarious about Sanko and WBC agreeing to amend the charter party to provide for arbitration of disputes in New York pursuant to U.S. federal maritime law is unfounded. In any case, absent extenuating circumstances not present here, the intentions of the contracting parties, WBC and Sanko, as to choice of law should be followed and U.S. law

applied.  *See Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 419 (4th Cir.

2009)(concluding that the choice-of-law provision in bunker confirmation should be enforced

and that U.S. law was therefore applicable to claimant's *in rem* claim against the vessel and,

upon applying U.S. law, finding that a maritime lien arose under U.S. law); see also *Bominflot,*

*Inc. v. M/V Henrich S*, 465 F.3d 144, 148 (4th Cir. 2006)("Because no 'other law' is specified on

the face of the contract and public policy does not counsel against it, we will respect the parties'

intentions and apply English law").   Concomitantly, Attaching Plaintiffs' discussion of English

law[12] as governing the Sanko–WBC charter party is inapposite.  *See* Doc. #90 at 3-5 and Doc.

#62 at 19, 21.

      Moreover, Attaching Plaintiffs' contentions regarding English law are wholly

unpersuasive.   Indeed, even assuming *arguendo* that the Sanko - WBC charter party were

governed by English law, U.S. law should still be applied to WBC's lien claims in this action

given that the parties and the underlying dispute have substantial and ongoing ties with the

United States.   *See Hawkspere Shipping Co.,* 330 F.3d 225, 234-235 (4th Cir. 2003)("Given . . .

that the goods were shipped to and seized in Baltimore; that [the parties] had substantial and

ongoing ties with the United States; and that the only contact with England is a choice-of-law

clause in a charter party that simultaneously attempts (by way of its USA Paramount provision)

to select the law of the United States, the district court did not err in holding that the United

States has a stronger connection to this dispute than any other country, and that its law

governs."); *see also Nikko Shipping Co. v. M/V Sea Wind*, 941 F.Supp. 587, 588 (D.Md. 1996)

---

[12] Liquimar has submitted an "Opinion" of an English solicitor who opines that WBC's claim against Sanko for breach of charter party does not give rise to a maritime lien under English law.  *See* (Doc. #90-1; Ex. 1).  Beyond the fact that the discussion of English law is inapposite for the reasons explained above, there are two further problems with Attaching Plaintiff's contentions.  First, they failed to give the required notice under Fed. Civ. 44.1.  Secondly, the "Opinion" of Liquimar's English solicitor is inadmissible because it does not conform to the requirements of a sworn affidavit or even an unsworn declaration -- and moreover is not even signed.

(lien based on breach of charter party found to arise under U.S. law for Rule C arrest purposes even though the charter party called for disputes to be submitted to arbitration in London, England); *see* also *E.A.S.T., Inc. of Stamford v. M/V Alaia*, 673 F.Supp. 796, 804 (E.D.La. 1987)(U.S. law applied to the lien claims asserted in U.S. arrest proceeding even though charter party called for disputes to be resolved in English arbitration under English law).

Alternatively, WBC maintains that the forum selection clause is irrelevant with regard to the Rule B and Rule C claims and U.S. law should apply as it is the law of the forum.  There is ample case authority to support the position that a forum selection clause contained in a charter party does not bar maritime claimants from utilizing security remedies such as Supplemental Rule B and C.  *See Mediterranea di Navigazione Spa v. Int'l Petrochemical Group S.A.*, 2007 WL 1434985, at \*4-5 (S.D.N.Y. May 15, 2007) (English choice of law does not preclude claimants from using maritime remedies available in other forums).

Accordingly, even if it is determined that English law governs the substantive disputes between Sanko and WBC, which it does not, this would have no impact on the validity of WBC's lien against the SANKO MINERAL pursuant to Supplemental Admiralty Rule C. Circuit Judge Niemeyer of the Fourth Circuit Court of Appeals endorsed such a position when he concurred in part and dissented in part in *Hawkspere*, *supra*:

> While English law recognizes the enforcement of maritime liens in cargo for the payment of freight, it does not provide the procedural mechanism for the arrest of the cargo and the entry of in rem judgment against the cargo. Thus, if this concededly legal maritime lien were being enforced in England, an in rem judgment would not be available.  But because the action was commenced in the United States, the procedure of the forum should be applied in enforcing the lien. American procedure specifically provides -- in the Supplemental Rules for Certain Admiralty and Maritime Claims -- for the enforcement of maritime liens through in rem actions. See Fed. R. Civ. P. Supp. R. C(1)(a).

*Hawkspere Shipping Co.,* 330 F.3d 225, 241.  In sum, the procedural devices employed under American law to enforce maritime liens are not inconsistent with the substantive provisions of English law that recognize the lien but leave enforcement to a different process.

Lastly, the Attaching Plaintiffs' argument that WBC is not entitled to a maritime lien against the Vessel is nothing more than obfuscation masquerading as legal argument and must be rejected.  *See (*Doc. #90 at 5-6).  As this Court previously held in *Nikko Shipping Co. v. M/V Sea Wind*, 941 F.Supp. 587, 589-90 (D.Md. 1996):

> Under American law, it is firmly established that the breach of a charter party that is not merely executory creates a maritime lien. See, e.g. *Rainbow Line, Inc. v. M/V TEQUILA*, 480 F.2d 1024, 1027 (2d Cir. 1973) ("The American law is clear that there is a maritime lien for the breach of a charter party [provided that it is not merely executory].")); *International Marine Towing v. Southern Leasing Partners*, 722 F.2d 126, 130 (5th Cir. 1983) (same), *cert. denied sub nom.*, *First Miss. Nat'l Bank v. International Marine Towing*, 469 U.S. 821, 83 L. Ed. 2d 40, 105 S. Ct. 94 (1984). The charter party between Nikko and Kite is clearly not executory, and, thus, its breach creates an enforceable maritime lien under applicable American law. Accordingly, Nikko was entitled to arrest the M/V SEA WIND under Rule C, and Kite will be ordered to post security.

*Nikko Shipping*, 941 F.Supp. at 589-90.  As in *Nikko Shipping*, the charter party contract between Sanko and WBC is clearly not executory and, thus, its breach creates an enforceable maritime lien in WBC's favor against the Vessel.

For all the foregoing reasons, regardless of whether English law or American law governs, WBC has a valid lien claim against the Vessel.[13]

## CONCLUSION

For all of the foregoing reasons, Western Bulk Carriers AS, The Sanko Steamship Co., Ltd. and The Bank of Tokyo-Mitsubishi UFJ, Ltd. respectfully submit that they have established

---

[13] To the extent relevant to the Court's consideration of the futility issue, even if the Court finds WBC's lien claim is not reasonably likely to succeed, the costs for discharging the cargo at Baltimore would still be costs of *custodia legis*, and the transshipment costs would still factor in to the futility mathematical analysis because the transshipment costs have also been claimed as damages by all of the cargo parties as part of their respective lien claims.

that the Rule B attachments of the Attaching Plaintiffs are futile and/or otherwise do not satisfy the requirements of Rules B or E.   Therefore, the Vessel Interests respectfully request this Honorable Court to vacate the Rule B Attachments issued in favor of the Liquimar Plaintiffs (Doc. #6) and Knightsbridge Tankers Limited (Doc. #18).

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Alexander M. Giles, Fed. Bar No. 25474 | Patrick F. Lennon, *pro hac vice* |
| SEMMES BOWEN AND SEMMES | LENNON, MURPHY, CAULFIELD & |
| 25 S Charles St., Ste. 1400 | PHILLIPS, LLC |
| Baltimore, MD 21201 | The GrayBar Building |
| (410) 539-5040 | 420 Lexington Avenue |
| (410) 539-5223 (fax) | New York, New York 10170 |
| agiles@semmes.com | (212) 490-6050 |
| | (212) 490-6070 (fax) |
| | pfl@lmcplegal.com |

*Attorneys for Western Bulk Carriers AS*

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Jason Gaarder | William R. Bennett, *pro hac vice* |
| WEST & GAARDER, LLC | BENNETT, GIULIANO, MCDONNELL & |
| 409 Washington Avenue, Suite 1010 | PERRONE, LLP |
| Baltimore, MD 21204 | 494 Eighty Avenue, 7th Floor |
| (410) 296-4655 | New York, New York 10001 |
| (410) 296-6654 (fax) | (646) 328-0120 |
| jgaarder@westgaarder.cm | (646) 328-0121 (fax) |
| | wbennett@bgmplaw.com |

*Attorneys for The Sanko Steamship Co., Ltd.*

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Philip T. Evans, Fed. Bar No. 11796 | James H. Hohenstein, *pro hac vice* |
| HOLLAND & KNIGHT LLP | Brad L. Berman, *pro hac vice* |
| 2099 Pennsylvania Avenue, N.W., Suite 100 | HOLLAND & KNIGHT LLP |
| Washington, D.C. 20006 | 31 West 52nd St. |
| (202) 457-7043 | New York, NY 10019 |
| (202) 955-5564 (fax) | (212) 513-3213 |
| philip.evans@hklaw.com | (212) 385-9010 (fax) |
| | james.hohenstein@hklaw.com |
| | brad.berman@hklaw.com |

*Attorneys for The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 28th day of June 2012, I caused a copy of the forgoing

Memorandum of Law to be filed via the Court's CM/ECF system for service on all counsel of

record.


_____/s/_____
Patrick F. Lennon