EXHIBIT "A"

# THE LAW OF ADMIRALTY

SECOND EDITION

By

GRANT GILMORE

Sterling Professor of Law, Yale Law School

and

CHARLES L. BLACK, Jr.

Henry R. Luce Professor of Jurisprudence
Yale Law School

Mineola, New York
THE FOUNDATION PRESS, INC.
1975

trial court should (in the absence of a "borrowing" statute) decide on the equities of the case which statute it wants to apply.[419b]

§ 9–83. Under the Ship Mortgage Act liens arising prior in time to a mortgage have priority over it while most subsequent contract liens are subordinate to it. The Act also provides that nothing in it shall be construed to affect the rules of maritime law as to priorities among liens or as to loss of lien through laches. The two provisions taken together create more than one logical puzzle. One, which involves priorities, has already been mentioned: the pre-mortgage lien, which prevails over the mortgage, may under maritime law be subordinate to the post-mortgage lien, which, in its turn, is subordinate to the mortgage. When the problem has been posed as one involving a system of circular priorities, the courts have broken out of the circle by relegating the post-mortgage lien to third place, after the pre-mortgage lien and the mortgage.[420]

Comparable questions arise when the pre-mortgage lienholder can be described as having been guilty of laches. On the lowest level of complexity is the situation of a lienholder who, knowing that a mortgage loan is about to be made, takes no steps to disclose his claim to the prospective mortgagee or affirmatively misleads the mortgagee into thinking that he has no claim.[421] The situation becomes more complex when the lienholder has no notice of the mortgage (except constructive notice from its recordation). Judge Allred dealt with this situation in The J. R. Hardee.[422] A mortgage had become preferred under the Ship Mortgage Act on August 22, 1950. Two supply liens were claimed, one for supplies furnished between February and May, 1950, the other for supplies furnished between January and July, 1950. Both lienors continued to furnish supplies for some months after recordation of the mortgage; one of them never received any payments on his account, the last payment to the other was in October, 1950. The ship was libeled by a salvage lienor in November, 1951. Judge Allred held that the pre-mortgage supply liens had lost their priority over the mortgage, being "guilty of laches by virtue of the long delay in asserting their claims, if, indeed, they did not waive them." It will be noted that the supply liens

---

419b. See Argyll Shipping Co., Ltd. v. The Hanover Ins. Co. (S/S Percy Jordan), 297 F.Supp. 125, 1968 A.M.C. 2195 (S.D.N.Y.1968) in which Judge Metzner, taking the Bournias case as governing authority, concluded that, under the New York borrowing statute, a Japanese statute of limitations should be looked to as the standard for determining laches. See further Judge Brown's discussion of these points in Vega v. S/S Malula, 291 F. 2d 415, 1961 A.M.C. 1698 (5th Cir. 1961).

420. See § 9–71 *supra*.

421. See The Eastern Shore (R.F.C. v. New Castle Terminal Co.), 31 F.Supp. 964, 966, 1940 A.M.C. 388, 391 (D.Md. 1940): "[W]hile there were valid maritime liens [for certain repairs] prior to the mortgage they were at least impliedly waived and subordinated to the mortgage by the conduct of the claimant" in having failed to bring them to the mortgagee's attention.

422. 107 F.Supp. 379, 1952 A.M.C. 1124 (S.D.Tex.1952). The J. R. Hardee is discussed in another context § 9–76 *supra*.

thus summarily disposed of in The J. R. Hardee were by no means old or stale when the mortgage loan was made. Both liens were asserted within two years of the oldest item in the accounts, thus comfortably within the contract statute of limitations, and there is no mention of any state lien statute with "loss of lien" provisions comparable to those in the New York statute previously discussed.[423] Yet the liens were held barred against the mortgage (which swallowed up the entire fund available for distribution) on the ground of a delay in enforcement of somewhat more than a year after the execution of the mortgage, the ship having apparently been at all times in local waters and available to process.

Further complexities were suggested by Judge Aldrich in National Shawmut Bank v. The Winthrop [424] which, like The J. R. Hardee, involved a mortgage flanked by prior and subsequent contract liens. Judge Allred in The J. R. Hardee had not bothered much about the post-mortgage liens, since he found the pre-mortgage liens guilty of laches against the mortgage and the mortgage exhausted the distribution fund. In The Winthrop it occurred to Judge Aldrich to speculate on the situation which would arise if the pre-mortgage liens were not guilty of laches against the mortgagee but were guilty of laches against post-mortgage lienors. "If," he wrote, "laches occurred after the mortgage but before the post-mortgage liens, either the post-mortgage lienors may not get the due benefit of this because the ante-mortgage liens will be preferred over the mortgage which in turn is paramount to them, or, if the post-mortgage liens are given preference over the guilty liens because of their laches, this benefit will in turn accrue to the mortgage since it is paramount to the post-mortgage liens." Whereupon the case was referred back to the commissioner for the taking of further testimony. Judge Aldrich seems to have constructed his dilemma principally out of the assumption that the post-mortgage lienors were to be ranked as good faith purchasers.

In a second opinion,[425] after the taking of further testimony, Judge Aldrich, although adhering to his earlier position that subsequent lienors could be ranked as good faith purchasers for purposes of application of the laches doctrine, nevertheless chose to ignore his own speculations in the first opinion. He concluded that the proper order of distribution should be: (1) the ante-mortgage liens, except any barred by laches at the date of the mortgage; (2) the mortgage; (3) the post-mortgage liens, on the calendar year rule; (4) 1951 [i. e. ante-mortgage] liens guilty of laches at the date of the mortgage. Thus any post-mortgage laches on the part of the ante-mortgage lienors was disregarded, and the suggestion that the post-mortgage lienors would rank as good faith purchasers with respect to prior liens receded into dictum. On the

---

423. See § 9–79 *supra*.

424. 129 F.Supp. 661, 1955 A.M.C. 1288 (D.Mass.1955).

425. 134 F.Supp. 370, 1955 A.M.C. 2089 (D.Mass.1955).

other hand, the existence of the post-mortgage liens may have induced Judge Aldrich to apply a more than usually strict rule in determining which of the pre-mortgage liens had lost their statutory priority by reason of laches at the date of the mortgage, being relegated as a result to fourth and last priority. Indeed the rule which he adopted was that all pre-mortgage liens more than ten months old at the time the mortgage lien arose were guilty of laches vis-a-vis the mortgage. He remarked, without further explanation, that ten months, as the commissioner who had heard the case had found, was "the normal period . . . for laches" and cited The Everosa [426] in support of the ten month rule.

If The J. R. Hardee and The Winthrop are to be taken, on their own terms, as laches cases, it might seem that both cases would require reexamination in the light of the judicial consensus which developed during the 1960's that laches mean not so much delay as prejudice.[426a] It would surely be difficult to the point of impossibility to rationalize Judge Allred's holding in The J. R. Hardee in terms of prejudice to the mortgagee: on the assumption that the mortgage was initially subordinate to the pre-mortgage liens, no delay by the lienors, however protracted, in asserting their claims could possibly prejudice the mortgage in the sense of making his position worse than it had been to start with. It is submitted, however, that there is a great deal more to be said for both cases than would be revealed by an examination in terms of laches.

The point should be made that, apart from the Ship Mortgage Act, there has never been a problem of laches with respect to contract liens among themselves. The earlier liens were subordinated to the later liens under the relevant priority rules.[426b] Thus there was no need to inquire whether a lien, already subordinated, should be further stigmatized as guilty of laches.[426c] The Ship Mortgage Act, unwisely, gave the pre-mortgage liens a priority to which they had never been entitled under the general maritime law and stripped the post-mortgage liens of the priority to which they were entitled under that law. Short of holding the Act unconstitutional, there is no escape from the conclusion that a preferred ship mortgage must be subordinate to some pre-mortgage contract liens, just as it must have priority over some post-mortgage contract liens. It does not, however, follow, either as a matter of sound policy or as a matter of sensible statutory construction, that, without limitation of time, the mortgage must forever remain subordinate to all pre-mortgage liens or, for that matter, must forever retain its priority over all post-

---

426. On the Everosa cases (which involved the effectiveness of supply liens against a good faith purchaser), see text following note 384 *supra*.

426a. See § 9–80 *supra*, text following note 402.

426b. See § 9–62 *et seq. supra*.

426c. See, however, the discussion of the "loss of lien" provision of the old state lien statutes and the rule of The Owyhee, § 9–79 *supra*. For the reasons stated in our earlier discussion it seems "in the highest degree unlikely that The Owyhee will ever be heard from again."

.ge liens may have in-
ually strict rule in de-
ad lost their statutory
e mortgage, being rele-
Indeed the rule which
more than ten months
uilty of laches vis-a-vis
r explanation, that ten
he case had found, was
d cited The Everosa [426]

re to be taken, on their
it both cases would re-
al consensus which de-
not so much delay as
e point of impossibility
R. Hardee in terms of
that the mortgage was
no delay by the lienors,
ould possibly prejudice
tion worse than it had
1at there is a great deal
evealed by an examina-

om the Ship Mortgage
vith respect to contract
ire subordinated to the
:6b Thus there was no
dinated, should be fur-
ship Mortgage Act, un-
ity to which they had
te law and stripped the
ley were entitled under
ional, there is no escape
nortgage must be sub-
, just as it must have
ens. It does not, how-
licy or as a matter of
limitation of time, the
all pre-mortgage liens
priority over all post-

1owever, the discussion of
if lien" provision of the old
statutes and the rule of The
9-79 *supra*. For the rea-
l in our earlier discussion it
the highest degree unlikely
Owyhee will ever be heard
."

---

mortgage liens. There is place for a rule of reason here as there is in the solution of most legal problems.

The Ship Mortgage Act itself invited the courts to discuss the problem of the relative priority of mortgages and liens in terms of laches. Section 974 of the Lien Act (reenacted in 1920 as part of the Ship Mortgage Act) provided in part:

> "[T]his chapter [i. e., the Ship Mortgage Act] shall not be construed to affect the rules of law existing on June 5, 1920, in regard to . . . (2) laches in the enforcement of liens upon vessels . . ."

The principal or core meaning of the word "laches" in 1920 was of course "delay". That the word suffered a sea-change of meaning during the 1960's and has come to mean "prejudice resulting from delay" should not lead on to the conclusion that the 1970 meaning of "laches" is automatically to be read back into the 1920 statute. Furthermore, the idea of laches, whether it means prejudice or merely delay, has its principal use in litigation between a libellant and a ship owner, where the most obvious type of prejudice to the shipowner is that as the result of the lapse of time he is no longer able to make an effective defense because memories have eroded, witnesses have become unavailable and so on. Where priority disputes arise between or among lienors, mortgagees and purchasers—that is, third parties who have dealt with the shipowner or the ship—laches, whatever the word means, is not a helpful concept. It is not unreasonable to take the "laches" reference in § 974(a) as inviting the courts to apply equitable principles in determining relative priorities between mortgages and liens. As Judge Brown has colorfully reminded us:

> "The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels." [426d]

And in the life history of any statute the need to resort to equitable principles for its construction increases as the statute withers away into old age.

Judge Aldrich's holding in The Winthrop can easily be rephrased in terms of equitable subordination. He held in effect that liens which were stale at the time the mortgage loan was made would be relegated to last priority. The "ten month rule" which he used to determine staleness was close to either the calendar year rule or the twelve month rule used in determining lien priorities.[426e] He held, that is, that a contract lienor who had let his lien become stale would be subordinated not only to the later pre-mortgage contract liens but

---

426d. Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co., 303 F.2d 692, 699, 1962 A.M.C. 1710, 1720 (5th Cir. 1962). The case involved laches, but not the specific problem here under discussion.

426e. See § 9-66 *supra*.

to the mortgage and post-mortgage liens as well. Judge Allred's holding in The J. R. Hardee that pre-mortgage liens which were not stale when the mortgage was taken out would nevertheless be subordinated because of post-mortgage delay in enforcement is more complicated. On the facts of The J. R. Hardee, the actual beneficiary of the holding was the mortgagee whose claim exhausted the distribution fund. However, if the mortgage claim had been smaller or the fund larger, the post-mortgage liens would also have shared as beneficiaries of the subordination. We cannot entirely escape from the albatross of the ill-advised priority provisions of the Ship Mortgage Act. But The Winthrop and The J. R. Hardee make life with the albatross a good deal easier than it might otherwise have been.[426f]

In Merchants and Marine Bank v. The T. E. Welles [426g] Judge Brown indicated in a thoughtful footnote that he did not think that either The Winthrop or The J. R. Hardee had been rendered obsolete by changing attitudes toward the idea of laches. The footnote was dictum since the issue did not have to be decided in The T. E. Welles [426h] but is well worth pondering. Judge Brown returned to the problem in Florida Bahamas Lines, Ltd. v. Steel Barge "Star 800" of Nassau [426i] in which he once again cited both The Winthrop and The J. R. Hardee as authoritative in such "lien-priority" contests. The case involved a lien for wharfage claimed to have priority over a preferred mortgage.[426j] The "mortgagor" and the "wharfinger", both of whom had been controlled by a man named Brown, had been in collusion to defraud the mortgagee by running up charges entitled to priority over the mortgage which would swallow up the value of the

---

**426f.** In Heller v. M/V Mr. Ed., 270 F. Supp. 830, 1968 A.M.C. 1089 (E.D.La. 1967), 273 F.Supp. 926, 1968 A.M.C. 716 (E.D.La.1967) a mortgagee, whose mortgage had become preferred on July 13, 1965, initiated foreclosure proceedings on June 30, 1966. Judge Rubin, without citing or discussing The J. R. Hardee, held that pre-mortgage supply liens, which had accrued immediately before the mortgage became preferred, were not br,red by laches against the mortgage. It will be noted that the foreclosure proceedings were initiated within a year of the time when the liens accrued.

In United States v. F/V Voyager, 1973 A.M.C. 1742 (E.D.Va.1973) Judge Hoffman concluded that the conditional seller of a "fishscope" which was installed on the Voyager was entitled to the status of a maritime lienor (as a furnisher of "supplies, repairs . . . or other necessaries" under the Maritime Lien Act). (This aspect of the case is discussed note 296ii supra.) The fishscope was installed in April, 1954; the United States, which did not know of the conditional sale of the fishscope, took a preferred mortgage on the Voyager in August, 1957. The mortgagors defaulted on their mortgage payments in 1962; the United States initiated foreclosure proceedings in August, 1962. Payments under the fishscope contract had apparently been in default since 1954 but the seller made no attempt to enforce his rights until he intervened in the foreclosure. Judge Hoffman held that the seller's "lien" was not barred by laches when the mortgage was taken out and that his post-mortgage delay was irrelevant.

**426g.** 289 F.2d 188, 1961 A.M.C. 1042 (5th Cir. 1961).

**426h.** See note 397b supra.

**426i.** 433 F.2d 1243, 1970 A.M.C. 2189 (5th Cir. 1970).

**426j.** Since a foreign mortgage was involved, the lien would have had priority over the mortgage for post-mortgage as well as pre-mortgage services under § 951 of the Ship Mortgage Act, see § 9–70 supra.

[left column partially obscured by scanning artifact]

l. Judge Allred's hold-
is which were not stale
theless be subordinated
it is more complicated.
beneficiary of the hold-
l the distribution fund.
ller or the fund larger,
l as beneficiaries of the
m the albatross of the
ortgage Act. But The
th the albatross a good
st

T. E. Welles [426j] Judge
t he did not think that
been rendered obsolete
hes. The footnote was
decided in The T. E.
e Brown returned to the
eel Barge "Star 800" of
The Winthrop and The
priority" contests. The
to have priority over a
l the "wharfinger", both
ed Brown, had been in
g up charges entitled to
llow up the value of the

he fishscope, took a preferred
on the Voyager in August,
he mortgagors defaulted on
tgage payments in 1962; the
States initiated foreclosure
gs in August, 1962. Pay-
nder the fishscope contract
arently been in default since
the seller made no attempt
ce his rights until he inter-
the foreclosure. Judge Hoff-
d that the seller's "lien" was
ed by laches when the mort-
s taken out and that his post-
e delay was irrelevant.

F.2d 188, 1961 A.M.C. 1042
1961).

note 397b *supra*.

F.2d 1243, 1970 A.M.C. 2189
1970).

ce a foreign mortgage was in-
the lien would have had prior-
· the mortgage for post-mort-
well as pre-mortgage services
951 of the Ship Mortgage Act,
0 *supra*.

---

vessel. Judge Brown commented that: "In the long history of the application of laches in admiralty, including lien-priority contests as our own, none is more compelling in terms of equities than this case." The upshot was that the wharfage claim "whatever its status as a maritime lien against the vessel in view of the relationship of the parties, is barred by laches as against the mortgage claim of the mortgagee." Judge Brown continued to use the traditional term "laches" but might equally well have said that the lien was being subordinated to the mortgage on equitable principles.

There remains the problem, which has so far not been much discussed in the cases, whether the mortgagee's priority over post-mortgage contract liens can ever be lost on theories of laches, equitable subordination or what not. Such an argument was made by post-mortgage lienors in The Favorite but was successively rejected by Judge Conger in the District Court and by Judge Augustus Hand in the Second Circuit [426k] and does not seem to have been advanced in any subsequent case.[426l] In The Favorite a mortgage which had become preferred on December 26, 1929, was not paid at maturity (April 1, 1930) and from then on was apparently in default although the mortgagor continued to make and the mortgagee to receive payments on account of both principal and interest. Liens for supplies and repairs accrued in 1938 and the lienors libeled the vessel in 1939 when it became apparent that the owner-mortgagor was hopelessly insolvent.[426m]

In The Favorite the mortgagee got the benefit of the repairs (which presumably increased the value of the vessel) and the supplies (presumably the payments which the mortgagor continued to make were derived from his commercial operation of the vessel). On the other hand the mortgage had been recorded with the Collector of Customs and indorsed on the ship's papers, so that the materialmen knew, or ought to have known, of it. Thus they could have protected themselves by refusing to make the repairs or furnish the supplies except for cash or other adequate security. And, from all that appears, the mortgagee had no reason to know that the mortgagor was insolvent or that the situation was hopeless, particularly in view of the fact that, although the mortgage was technically in default, the mortgagor went on making payments up to 1939 when the libels were filed.

---

426k. 34 F.Supp. 324, 1940 A.M.C. 958 (S.D.N.Y.1940), affirmed 120 F.2d 899, 1941 A.M.C. 1073 (2d Cir. 1941). See § 9-53 *supra*, text following note 271. Judge Conger cited The Red Lion, 22 F.2d 329 (E.D.N.Y.1927) as "some precedent for my holding." The opinion in The Red Lion is notably obscure but the case does not seem to have involved the problem of mortgagee's laches vis-a-vis post-mortgage liens.

426l. The Franz Joseph, digested note 273a *supra*, followed The Favorite on the laches point but the case did not involve priorities between a mortgage and post-mortgage liens.

426m. The District Court opinion does not give the date when the liens accrued. Judge Hand's opinion refers to repairs having been made eight years after the maturity date of the mortgage—thus in 1938.

It is not difficult, however, to construct a case in which the equities would be weighted on the side of the post-mortgage liens. Assume that a mortgagee knows that his mortgagor is insolvent and also knows that the mortgagor, if he continues to operate the vessel, will necessarily run up large bills for supplies and repairs which he will be unable to pay in the ordinary course of business. If, under such circumstances, after default, the mortgagee allows the mortgagor to continue his operations, there would be good reason to hold that the mortgage had lost its priority over the post-mortgage liens. It would make no difference whether the result was rationalized in terms of laches (the prejudice to the lienors is sufficiently obvious) or in terms of subordination on equitable principles.

The conclusion is that there is no more reason to take the mortgage's priority over post-mortgage liens as absolute than there is to take the mortgage's subordination to all pre-mortgage liens as absolute. On an appropriate set of facts the holdings in The Winthrop and The J. R. Hardee with respect to pre-mortgage liens could be duplicated in a case which involved post-mortgage liens.

§ 9–84. "Waiver" is a word that occasionally appears in the opinions in the older cases as a synonym for laches in cases which hold that a claimant has lost his lien by delay. The term has some meaning when it is used with reference to the failure of a lien to attach in the first place, because the materialman has extended credit to the owner and not to the ship, taken collateral security, or otherwise evidenced his intention not to insist on his lien.[427] When, however, it is conceded that a lien has attached at the time the services were furnished, "waiver", unless it refers to an express agreement by which the lienor releases his claim against the ship, seems to be merely a word which some judges like to use for stylistic effect, by itself or in double harness with its more industrious companion "laches". It is clear that the subsequent taking by the lienor of collateral security for his claim —for example, an assignment of freights [428]—or of acceptances or notes from the owner [429] or the working out with the owner of schedules of payment or the like [430] will not be stigmatized as acts of waiver. On the contrary such attempts to secure or satisfy the debt will in all probability be looked on as satisfactory evidence of the lienor's diligence and will thus serve to protect him against the charge of laches.

### Same: Execution of Liens by In Rem Decree. (Herein of Distribution of Proceeds and Effect of Stipulation for Value)

§ 9–85. Only the admiralty court acting *in rem* has the power to divest liens by a judicial sale. Here we touch the central point of

---

427. See § 9–38 *supra* and the cases there cited.

428. The City of Athens (Todd Shipyards Corp. v. Soc. Naviera Trans-Atlantica, S. A.) 83 F.Supp. 67, 1949 A.M.C. 572 (D.Md.1949).

429. The Everosa (Southern Coal & Coke Co. v. Kugniecibas), 93 F.2d 732, 1938 A.M.C. 82 (1st Cir. 1937).

430. Virginia Shipbuilding Corp. v. U. S. Shipping Bd. Emergency Fleet Corp., 11 F.2d 156, 1925 A.M.C. 668 (E.D.Va.1925).