## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| EVRIDIKI NAVIGATION, INC. et al. | * | |
|   and | | |
| ORPHEAS NAVIGATION, INC. | * | CIVIL ACTION NO. |
|   and | | |
| PAULINE SHIPPING LIMITED, et al | * | 1:12-cv-1382 JKB |
| | | |
|     Plaintiffs | * | |
| | | |
| v. | * | |
| | | |
| THE SANKO STEAMSHIP CO. LTD. | * | |
| | | |
|     Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*

**INTERVENING PLAINTIFF, KNIGHTSBRIDGE TANKERS
LIMITED'S SUPPLEMENTAL MEMORANDUM OF LAW
PURSUANT TO THE COURT'S ORDER DATED JUNE 22, 2012**

Intervening plaintiff, Knightsbridge Tankers Limited ("KTL"), respectfully submits this

supplemental memorandum of law pursuant to the Court's order dated June 22, 2012 (the "June

22 Order") (Docket No. 97), and in further opposition to intervening plaintiff Western Bulk

Carriers AS ("WBC")'s Emergency Motion to Vacate Attachments and/or For Order Directing

Cargo Be Discharged (Docket No. 32).

**Preliminary Statement**

As set forth in KTL's first memorandum of law in opposition to WBC's motion to vacate

(Docket No. 62), and as explained more fully below, this Court lacks the authority in equity to

rule on the issue of futility advanced by WBC and The Sanko Steamship Co., Ltd. ("Sanko").

The Second Circuit's decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d

434 (2d Cir. 2006), *abrogated on other grounds*, *Shipping Corp. of India Ltd. v. Jahldi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009), is the leading decision explaining the limitations on the court's authority in equity in considering a motion to vacate a Rule B attachment. *Accord Proshipline Inc. v. Aspen Infastructures Ltd.*, 609 F.3d 960, 969 (9th Cir. 2010) ("[W]e agree with and adopt the contours of equitable vacatur laid out by the Second Circuit."). In *Aqua Stoli*, the Second Circuit held that a valid Rule B attachment should only be vacated on equitable grounds in certain limited circumstances and rejected the argument that the court's authority in equity was broad. Instead, the court found that the district court's equitable power is "severely circumscribed." *Aqua Stoli*, 460 F.3d at 444. None of the grounds for equitable vacatur recognized by the court in *Aqua Stoli* apply to KTL's attachment here. The court in *Aqua Stoli* reached its conclusion after an extensive, thoughtful and historical analysis of the origins and purposes of maritime attachments pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules").

Moreover, even if the Court were to conclude that it has the equitable authority to vacate KTL's attachment based on futility, neither WBC nor Sanko are entitled to equitable relief on this record. WBC and Sanko have failed to demonstrate that The Bank of Tokyo-Mitsubishi, UFJ, Ltd. ("BTMU") will foreclose on its mortgage against the Vessel. WBC and Sanko are requesting that this Court extend its equitable authority to vacate KTL's valid attachment based on speculation that BTMU may or may not foreclose on its mortgage and consume the proceeds from a hypothetical judicial sale. BTMU has stated that they do not wish or intend to move for a judicial sale and have not done so to date. (June 12 Tr. at 46-47) BTMU further concedes that it has agreed with nine other banks not to take such action and instead to allow Sanko to continue to operate the Vessel. (June 21 Tr. at 253-55) Further, there is no dispute that Sanko has at least

$3,300,000 to $3,400,000 in equity in the Vessel based on a valuation of the Vessel at $19,500,000.

Furthermore, WBC and Sanko have unclean hands which precludes any equitable relief they request.  Sanko is in breach of paying charter hire to KTL.  WBC has failed to comply with its contractual guarantee to its cargo interests that the Vessel would not be subject to any obligation, encumbrance, claim or lien of a finanical nature.  (Docket No. 42, Ex. 1)  WBC was well aware of Sanko's financial difficulties when it agreed to charter the Vessel in March, 2012. WBC no doubt received a lesser hire rate in exchange for the risk that the Vessel would be arrested or attached - - WBC chartered the Vessel with its eyes wide open.

Additionally, WBC and Sanko misstated to this Court in WBC's motion to vacate that the March 16, 2012 charter provided for U.S. law, when both parties and their counsel knew full well that was incorrect.  If WBC had acknowledged from the outset of the dispute that is has no lien, this "futility" analysis would never have occurred.  The March 16 charter provided for English law to govern, which precludes a maritime lien as alleged by WBC; the lawyers for WBC and Sanko only cooked up the so-called "Addendum" to change the choice of law provision fifteen days after the Vessel was attached and the same day WBC filed its intervening complaint seeking at Rule C arrest of the Vessel.  Cf. In re Coleman, 426 F.3d 719, 726 n.6 (4th Cir. 2005) (a party seeking equity must come before the court with clean hands).  In any event, as a matter of law, no lien may be created while a vessel is under attachment.  *Oil Shipping (Bunkering) B.V. v. The Royal Bank of Scotland*, 10 F.3d 1015 (3d Cir. 1993).

WBC and Sanko invite this Court to overlook the limited scope of its inquiry on a Rule E(4)(f) post-attachment hearing.  Under Rule E(4)(f), the Court's inquiry is limited to whether the plaintiff demonstrated a *prima facie* basis for the Rule B attachment.  *See Hawknet Ltd.*

*Overseas Shipping Agencies*, No. 07 Civ. 5912(NRB), 2008 WL 1944817, at *2 n.4 (S.D.N.Y. April 29, 2008) ("we read *Aqua Stoli* as strongly suggestin[ing] that courts should limit their Rule B inquiries to whether the plaintiff has stated a *prima facie* basis for the maritime attachment at issue.") (internal citations omitted). The Court is not authorized to engage in an intensive fact-finding inquiry. *See, e.g., C. Transp. Panamax, Ltd. v. Kremikovtzi Trade E.O.O.D.*, No. 07 Civ. 893(LAP), 2008 WL 2546180, at *3 (S.D.N.Y. June 19, 2008).

Moreover, WBC and Sanko fail to establish that BTMU's mortgage would necessarily trigger the priorities they allege. For example, if Liquimar were to obtain additional security from other sources or if BTMU were to continue its agreement with Sanko and other banks not to foreclose on the mortgage, no such priorities would fall into place at the time of a judicial sale, if any. There is no guarantee of a judicial sale if WBC, Sanko or their P&I insurers post the requisite security. If Sanko and/or BTMU post a bond, the Rule B claims will disappear and the Vessel may then discharge the cargo at the intended destinations. Their continued refusal to post substitute security demonstrates the preferred status Sanko is allowing other creditors, including BTMU and WBC. The limited evidence in the record raises legitimate questions of BTMU's control over Sanko, of whether BTMU's appearance in the case is a charade with no real intent to foreclose on the mortgage, and of BTMU's conduct in colluding with nine other Japanese banks and Sanko in an attempt to intimidate other lienholders and Rule B creditors. In any event, if the need arises, KTL should be allowed discovery on such a complex and fact-intensive issues.

Finally, at all relevant times, the charter between WBC and Sanko provided for English law. WBC does not dispute that, under English law, it has no maritime lien against the Vessel for Sanko's alleged breach of charter and for financial unseaworthiness. WBC continues to

mislead the Court by maintaining that "[t]he March 16, 2012 charter party contract between [WBC] and Sanko provides for . . . federal maritime law" and "[b]y reason of Sanko's breach of the March 16, 2012 charter party, [WBC] possesses a maritime lien against the Vessel pursuant to the maritime law of the United States and pursuant to the United States Code."  (Docket No. 21, at ¶¶ 16 and 19)   The testimony by WBC's representative demonstrates that this was a calculated decision by counsel for WBC and Sanko, working together to concoct a post-attachment maritime lien in WBC's favor which would prime KTL's attachment of the Vessel, and thus create the illusion that KTL's attachment is futile.  On this record of inequitable conduct, WBC and Sanko should be estopped from seeking such relief from this Court in the face of KTL's valid attachment of the Vessel.

## STATEMENT OF FACTS

KTL hereby incorporates by reference the statement of facts contained in its original memorandum of law.  (Docket No 62, at 5-8)

## Argument

## I.

### THIS COURT LACKS THE AUTHORITY TO VACATE KTL'S ATTACHMENT OF THE VESSEL ON GROUNDS OF FUTILITY

The *Aqua Stoli* decision makes clear that the doctrine of equitable vacatur must be used sparingly and that district courts should not weigh the equities of the underlying case at a Rule E(4)(f) hearing.[1]   The Fourth Circuit has recognized that "'[t]he post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary

---

[1] KTL hereby incorporates by reference pages 4-5, 9, 17-18 and 20 of its first memorandum of law in opposition to WBC's motion to vacate and motion for reconsideration.  (Docket No. 62)

determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond.'" *Mujahid v. M/V Hector*, 948 F.2d 1282 (4th Cir. 1991) (citing *Salazar v. Atlantic Sun*, 881 F.2d 73, 79-80 (3d Cir. 1989)); *see also* Rule E(5)(a) ("In the event of the inability or refusal of the parties so to stipulate ***the court shall fix the principal sum of the bond*** or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs.") (emphasis added).

The court in *Aqua Stoli* provided three examples of the "certain limited circumstances" where a district court may vacate a valid attachment on equitable grounds.[2] None of those limited circumstances apply to KTL's attachment here. Furthermore, the court in *Aqua Stoli* recognized: "'[E]quity powers of an admiralty court remain severely circumscribed . . . .'" *Aqua Stoli*, 460 F.3d at 444 (citing *Eddie S.S. Co. v. P.T. Karana Line*, 739 F.2d 37, 39 (2d Cir. 1984) (per curiam)).

Sanko should not be rewarded for failing to pay its debts and subsequently refusing to post security while hiding behind a "gentleman's agreement." (*See* June 21 Tr. at 254). As the *Aqua Stoli* court correctly observed: "[defendant] has the option of relieving itself of this particular attachment by posting other security. Rule E does not require [plaintiff] to go to . . . any other country to sue [defendant] or to obtain security as long as [defendant's] assets are available to [plaintiff] here. *Aqua Stoli*, 460 F.3d at 444.

The persuasive value of the *Aqua Stoli* decision lies, *inter alia*, in the fact that Rule E(4)(f) was modeled after former Local Rule 12 from the Southern and Eastern Districts of New York. The court in *Aqua Stoli* concluded: "We adopt as the Rule E(4)(f) standard the limited

---

[2] These examples are: (1) if the defendant is subject to suit in a convenient adjacent jurisdiction; (2) if the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; and (3) if the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. *Aqua Stoli*, 460 F.3d at 445.

former Local Rule 12 practice because it supports the time-honored policies embedded in Supplemental Rule B and the historical purposes of maritime attachments." *Id*.

By their "futility" argument, WBC and Sanko seek to distract the Court from the otherwise straightforward application of Rule E(4)(f). WBC and Sanko rely on one unreported district court decision from the Eastern District of Louisiana, which has never been approved by any other court. *See A. Coker & Co., Ltd. v. National Shipping Agency Corp.*, No. Civ.A. 99-1440, 1999 WL 1009808 (E.D. La. Nov. 5, 1999). They ask this Court to invent a new rule contrary to *Aqua Stoli*'s sound reasoning.

Unlike in *Coker*, the court here is asked to address the validity of the parties' claims and to speculate about the value of the *res*. Here, outstanding legal and factual questions exist in respect to the following: (1) whether WBC's alleged maritime lien is subject to English law, and thus invalid; (2) whether BTMU's mortgage is subject to equitable subordination; and (3) whether Liquimar has received alternative security. Furthermore, unlike *Coker*, here, the amounts of the parties' claims are ever changing and their enforcement remains speculative.

In *Aqua Stoli,* the Second Circuit vacated the district court's decision to vacate the plaintiff's maritime attachment of the defendant's electronic fund transfers. *Id*. at 447. There, the defendant asserted that the district court was correct in fashioning a needs-plus-balancing test based on factors such as the defendant's financial security and whether the attachment's burden on the defendant outweighed any benefit to the plaintiff. *Id*. at 439. In rejecting this argument, the Second Circuit noted: "In the district court's view, it possessed 'inherent power' to fashion an appropriate test for the vacatur of an attachment notwithstanding its validity under Rule B." *Id*. at 439.

Here, WBC and Sanko rely on factors such as Sanko's alleged inability to post substitute security as a result of the "Turnaround ADR" process in Japan. Sanko claims that the Rule B creditors should "get in line" with other creditors because they will be better off in the end. The Second Circuit in *Aqua Stoli* squarely rejected such "needs-plus-balancing" arguments as irrelevant in a Rule B analysis.

In *Aqua Stoli*, the court reasoned: "[No case] under Rule 12 provides support for the more expansive discretion applied by the court below and pressed here by [defendant]. To the extent that the parties rely on the history of the local practice under Local Rule 12, those cases support only the limited vacatur power argued by [plaintiff]." *Id*. at 442-43. The same rationale applies here with equal force.

## II.

### BTMU'S FOREIGN PREFERRED SHIP'S MORTGAGE AGAINST THE VESSEL IS SUBJECT TO THE DOCTRINE OF EQUITABLE SUBORDINATION

Even assuming that the mortgage on the Vessel is valid, the record does not show any guarantee that the priorities sought by Sanko's mortgagee, BTMU, would in fact apply. Courts exercising admiralty jurisdiction may apply the doctrine of equitable subordination to resolve priority disputes contrary to the statutory scheme. *Wardley Int'l Bank, Inc. v. Nasapit Bay Vessel*, 841 F.2d 259, 263 (9th Cir. 1988); *see Branch Banking & Trust Co. of Virginia v. M/Y BEOWULF*, No. 11–80692–CIV, 2012 WL 2064570, at *15 (S.D. Fla. June 7, 2012).

Four conditions must exist to justify equitable subordination of an otherwise superior claim: (1) a showing that the superior claimant is in a position of control over the debtor; (2) the claimant must have engaged in some type of inequitable conduct; (3) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (4)

equitable subordination of the claim must not be inconsistent with any statutory provision. *United States v. PRIDE OF TEXAS*, 964 F. Supp. 986, 990 (E.D. Va. 1994).

In *The Law of Admiralty* the well-respected professors Gilmore and Black envisioned the situation facing the claimants in this case.  There, the authors stated:

> It is not difficult, however, to construct a case in which the equities would be weighed on the side of the post-mortgage liens.  Assume that a mortgagee knows that his mortgagor is insolvent and also knows that the mortgagor, if he continues of operate the vessel, will necessarily run up large bills for supplies and repairs which he will be unable to pay in the ordinary course of business.  If, under such circumstances, after default, the mortgagee allows the mortgagor to continue his operations, there would be good reason to hold that the mortgage had lost its priority over the post-mortgage liens.  It would make no difference whether the result was rationalized in terms of laches (the prejudice of the lienors is sufficiently obvious), or in terms of subordination on equitable principles.

*Id*. at 786 (3d ed.).

In *K/S Ditlev Chartering A/S & Co. v. Egeria S.p.A di Navigazione*, No. 82-171-N, 1982 WL 195519, 1982 AMC 1817 (E.D. Va. Mar. 18, 1982) *appeal dismissed*, 722 F.2d 738 (4th Cir. 1983), the shipowner sought to quash an attachment and avoid posting a bond on the same grounds as Sanko here.  There, the shipowner argued there was no equity in the attached vessel to secure plaintiff's claim.   In that case, the vessel was valued between $4,500,000 and $6,000,000, with mortgages on the vessel exceeding $33,000,000.  In rejecting the shipowner's argument, the court recognized that reliance on such reasoning would "undermine the efficacy of foreign writes of attachment.  The court further stated:

> Vessel owners would mortgage their vessels beyond their fair market value and avoid attachment on the grounds that any bond requirement exceeds the value of the vessel.  Ship owners, under this reasoning, would be able to sail away and earn large profits

> and, 'in effect, thumb [their] noses at all [their] creditors in the
> world.'

*Id.* at 1821-22 (internal citations omitted).

A bank can forfeit its preferred position as a result of its inaction in foreclosing on its security where it knows or should have known of the mortgagor's insolvency, yet it continues to operate the vessel.  Such was the case in *M/Y BEOWULF*, *supra*, where the bank's superior debt was subordinated to other creditors because of the bank's delay in foregoing a declaration of default.  2012 WL 2064570, at *16.  There, the court recognized:

> Having failed to take the most elementary, reasonable precautions
> to protect its security interest in the collateral in early 2008, when
> it had the right, cause and opportunity to do so—all to the
> foreseeable detriment of subsequent purchasers and lienors of the
> collateral—the doctrine of equitable subordination is appropriately
> invoked now to displace its claimed priority status under the Act.

*Id.*

Another basis for equitable subordination in admiralty is the use of what amounts to a "sham" mortgage.  This occurs when the mortgagor is in such a relationship with the mortgagee that the mortgage is simply a device to give the true beneficial owner, the mortgagee, a preferred secured position to the detriment of other creditors.  Such was the case in in *Custom Fuel Services, Inc. v. Lombas Indus. Inc.*, 805 F.2d 561 (5th Cir. 1986).  In that case, the district court upheld the priority of the ship mortgage and the Fifth Circuit reversed on appeal.  The Fifth Circuit recognized: "[s]uch transactions, however, are subject to scrutiny for fraud, unfair dealing or other inequitable conduct.  Admiralty is no stranger to these principles.  Admiralty courts have not been hesitant to scrutinize preferred ship mortgages granted to related entities and, in appropriate cases, deny their priority."  *Id.* at 565.

In *Custom Fuels*, the Fifth Circuit concluded that the bank controlled the subsidiary and that it was the bank who decided to allow the subsidiary to defer its payments until its affairs

were in order. *Id.* at 566.  The court found that even though the transaction was legal and non-

fraudulent, the bank's mortgage should be subordinated because of other inequitable conduct,

specifically "undercapitalization," and the "use of the debtor as a mere instrumentality." *Id.* at

566-7.  The court reasoned:

> [u]ndercapitalization evidences a purported debt that is, in
> substance, a proprietary interest in the debtor. The use of the
> debtor as a mere instrumentality exposes the same sort of sham.
> The 'debtor' is not a true debtor, but an instrument of the
> controlling creditor—used for the creditor's benefit and to shield
> its property from the claims of other legitimate creditors.

*Id.* at 567.

Applying these rules to the instant case, sufficient grounds exist on this record to deny

WBC's motion at this early stage to permit sufficient discovery of the true nature of Sanko's

solvency, BTMU's control over Sanko, and further want of due equity on the part of Sanko and

BTMU in this proceeding.

The evidence shows that BTMU owns 4.3% of Sanko's stock and sits on a committee

with nine other banks, who by their unanimous decision alone decide whether to forebear

foreclosing on the assets of Sanko.  (June 21 Tr. at 253-55; BTMU Ex. 14 (BTMU 00282-283))

BTMU's ownership stake in Sanko for thirty years demonstrates that BTMU had an interest in

Sanko at the time it made further advances to Sanko for the purchase of the Vessel in 2008.  This

calls into question whether BTMU was entitled to preferred status from the inception of the very

mortgage underlying the BTMU's claim in this proceeding.  Sanko's suggestion that the banks

had no say in its decision to unilaterally cease paying 50% of shipowners' charter hire is

questionable.  (June 21 Tr. at 264-65) The evidence demonstrates that Sanko, with the banks'

explicit consent, has not made a principal payment since December 20, 2011, and there is no

plan as to when it will do so.  (June 21 Tr. at 238-39, 241 and 265)  Sanko presented its plan to

the bankers who did not object, presumably because this would allow them to collect interest payments on their loans.  (*Id*. at 238-39 and 262; BTMU Ex. 18 (BTMU 00313))

During the Vessel's continued operation, BTMU will receive, and did receive overnight of June 21, 2012, interest payments (BTMU Ex. 17 (BTMU 00312)), as a result of the unilateral decision by Sanko and BTMU to withdraw charter hire from Sanko's contractual counterparts. The evidence shows that Sanko is in default of the mortgage; Sanko is insolvent; BTMU is aware of Sanko's insolvency; BTMU has other means to satisfy its debt; and and yet continues to allow Sanko to operate the Vessel and incur further debts and liens.

Moreover, the record demonstrates that BTMU has exercised control over Sanko to the detriment of the Rule B claimants and the cargo owners, by failing to post security necessary to complete the voyage, or to allow Sanko to do so.  Sanko and BTMU assert that they are powerless as a result of their own "gentlemen's agreement" to protect the cargo owners who had the bad fortune of believing that Sanko/BTMU would either complete the voyage or honor Sanko's contractual agreement to post security within five days if the Vessel is attached or arrested.  (*See* WBC Ex. 1 (WBC 18-19 at cl. 46))  This Court noted at the hearing on May 31, 2012, that the "Turnaround ADR" agreement between Sanko and BTMU would not seem to bar fair treatment of cargo owners.  The record now shows that this is not the case.

BTMU claims that it "expressly reserves all of its rights and remedies under the Loan Agreement and/or the Mortgage and/or at law," but BTMU does not allege that it has any plans to foreclose on either the Loan Agreement or the Mortgage.  (Docket No. 81, at ¶ 31)  In fact, counsel for BTMU stated:

> Because of the Alternative Dispute Resolution proceedings in Japan, which are quasi-governmental, certain agreements have been made between Sanko and various creditors, including the bank . . . have been so advised by the lawyers in Japan.  It's very

> difficult for us to actually intervene and file the normal process, which would be to foreclose the mortgage.  The bank does not want to foreclose this mortgage.  Of course, at this point there has been no interlocutory motion for the sale of the vessel, so there is no, you know, impetus for the bank to file foreclosure of the mortgage at this point.

(June 12 Tr. at 46-47).

Contrary to the argument advanced by Sanko, BTMU and WBC, Sanko does have an equity interest in the Vessel.  On this record, it is unlikely BTMU will foreclose on the mortgage since it is receiving interest payments from Sanko and has agreed with the other Japanese banks not to do so.   Further, such an irrational decision by BTMU would leave the cargo claimants and others without a remedy other than inequitable subordination.   The Court should not sanction such inequitable conduct by precluding the attaching parties an opportunity to fully litigate these issues.

**III.**

**WBC'S CHARTER WITH SANKO WAS GOVERNED BY
ENGLISH LAW AT THE TIME OF THE ALLEGED BREACH;
WBC HAS NO MARITIME LIEN AGAINST THE VESSEL**

The Fourth Circuit has recognized that "[a] maritime lien accrues from the moment when the claim attaches." *Bominflot, Inc. v. The M/V HENRICH S*, 465 F.3d 144, 146 (4th Cir. 2006).  The record clearly demonstrates that at the time of Sanko's alleged breach of its charter with WBC, the charter provided for English law.[3]  Thus, since English law applied, no maritime lien arose in favor of WBC for breach of charter.   Under English law, WBC has only a breach of charter claim *in personam* just as the intervening plaintiffs are claiming here.  *See Bominflot*, 465

---

[3] KTL hereby incorporates by reference pages 18-22 of its memorandum of law in opposition to WBC's motion to vacate and motion for reconsideration (Docket No. 62), and pages 3-6 of Liquimar's memorandum of law dated June 20, 2012. (Docket No. 90)

F.3d at 147; *Hiedmar v. Anomina*, 993 F. Supp. 990 (S.D. Tex. 1997), *vacated on other grounds*, 132 F.3d 264 (5th Cir. 1998).

Clause 60 of the charter between WBC and Sanko provides:

> Arbitration in London and Standard Bimco Dispute Resolution Clause for London Arbitration under English Law including LMAA Small Claims.

(WBC Ex. 1 (WBC 12)).

WBC and Sanko maintain that there are no communications whatsoever between them in respect to their decision to change such a fundamental provision in their charter.   WBC's manager in charge of chartering vessels, Jan Christian Tungland ("Mr. Tungland"), confirmed he had no involvement in the decision to change the choice of law provision in the charter. (June 21 Tr. at 125-26)  Furthermore, WBC and Sanko have failed to demonstrate that any consideration was exchanged for their decision to include Addendum 1 in their charter.   Mr. Tungland confirmed that he did not know if WBC or Sanko paid any money or promised anything in exchange for Addendum 1.  *Id*. at 126.  Mr. Tungland admitted that the decision to exchange clause 60 for Addendum 1 "was done between lawyers," confirming that the principals at WBC and Sanko had little or no input on the legal ramifications of the application of English law to WBC's claim.

Indeed, counsel for WBC and Sanko are well aware that, under English law, WBC has no maritime lien. Their belated attempt to invoke U.S. law in the charter amounts to no more than an effort to create a lien by contract after the Vessel was attached.  The Fourth Circuit has rejected such litigation tactics.  *See Bominflot*, 465 F.3d at 145-47; *see also Triton Marine Fuels Ltd., S.A. v. Bridge Oil, Ltd.*, 575 F.3d 409, 416 (4th Cir. 2009) ("The inclusion of this choice-of-law provision, however, did not 'create[ ] by agreement' and such lien; the maritime lien would

still have to arise by operation of law."). If WBC has no maritime lien, then it has no Rule C right to arrest the Vessel, and thus no claim that would prime that of KTL. The record thus scuttles the claim by WBC and Sanko that KTL's attachment is futile.

## CONCLUSION

For the reason set for above and in KTL's memorandum of law dated June 12, 2012 (Docket No. 62), this Court lacks the authority to vacate KTL's valid maritime attachment on the basis of futility. In any event, WBC and Sanko have failed to demonstrate that KTL's Rule B attachment of the Vessel is futile. Thus, WBC's emergency motion to vacate KTL's Rule B attachment as futile should be denied.

In the alternative, KTL seeks further discovery from Sanko and BTMU in respect to the Loan Agreement, Vessel mortgage and the issue of equitable subordination.

        /s/
David W. Skeen #1082
Meighan G. Burton #28022
Wright, Constable & Skeen, L.L.P.
One Charles Center, 16th Floor
100 North Charles Street
Baltimore, MD  21201-3812
(410) 659-1324
*Attorneys for Intervening Plaintiff*
*Knightsbridge Tankers Limited*

and

        /s/
John R. Keough, III
Casey D. Burlage
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, New York 10174
(212) 710-3900

## NOTICE OF SERVICE

I HEREBY CERTIFY that on this 28th day of June, 2012, a copy of the foregoing Memorandum of Law was served via electronic filing and/or first class mail, postage prepaid, to: Geoffrey S. Tobias, Esquire, Ober, Kaler, Grimes & Shriver, A Professional Corporation, 100 Light Street, Baltimore, MD, 21202; Jason W. Gaarder, Esquire, West and Gaarder LLC, 409 Washington Avenue, Suite 1010, Baltimore, MD, 21204; William R. Bennett, III, Esquire, Bennett Giuliano McDonnell and Perrone LLP, 494 Eight Avenue, Seventh Floor, New York, New York, 10001, Attorneys for Defendant, The Sanko Steamship Co., Ltd.; and Patrick F. Lennon, Esquire, Lennon Murphy Caulfield and Phillips LLC, 420 Lexington Avenue, Suite 300, New York, New York, 10170, Attorney for Western Bulk Carriers AS.


                                                  _____/s/_____
                                                      Casey D. Burlage