IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| EVRIDIKI NAVIGATION INC, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL ACTION NO. JKB-12-cv-1382 |
| THE SANKO STEAMSHIP CO., LTD., | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## LIQUIMAR PLAINTIFFS' MEMORANDUM OF LAW REGARDING FUTILITY

Evridiki Navigation Inc, Orpheas Navigation Inc, and Pauline Shipping Limited (collectively, the "Liquimar Plaintiffs"), by and through counsel, Geoffrey S. Tobias, Caitlin Q. Vandevander and Ober, Kaler, Grimes and Shriver, hereby respectfully submit this Memorandum of Law Regarding Futility.

## ARGUMENT

### I.   THIS COURT DOES NOT POSSESS THE EQUITABLE AUTHORITY TO VACATE A RULE B ATTACHMENT ON THE GROUNDS OF FUTILITY.

The Sanko Steamship Co., Ltd. ("Sanko"), Western Bulk Carriers AS ("WBC"), and The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") (all, collectively, the "Vessel Interests") contend that this Court should dissolve the Liquimar Plaintiffs' attachment of the M/V SANKO MINERAL (the "Vessel") on the novel grounds of "futility." In doing so, the Vessel Interests boldly ask this Court to exceed its equitable powers and

prematurely vacate a valid and proper attachment.  In short, the Vessel Interests implore the Court to use its equitable powers to effectuate an inequitable result.  The Vessel Interests' request should be denied, and the Liquimar Plaintiffs' attachment should survive.

**A.      The Facts Of This Case Do Not Demonstrate The "Limited Circumstances" The *Aqua Stoli* Court Held Could Justify Vacating A Rule B Attachment.**

Under the framework set forth in *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006), the leading case on the standard for equitable *vacatur* of a maritime attachment, this Court has no discretion to vacate the Liquimar Plaintiffs' attachment.

The *Aqua Stoli* court acknowledged that a Rule B attachment may be vacated in the face of a Rule E(4) challenge; however, that court held that *vacatur* may be granted "only in certain limited circumstances."  *Aqua Stoli*, 460 F.3d at 444.  The court then carefully defined these "limited circumstances" by setting forth three explicit, individualized factual scenarios under which *vacatur* would be proper.  Specifically, the *Aqua Stoli* court held that a district court may vacate an attachment only if:

> 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Id.* at 445.  The *Aqua Stoli* decision demonstrates that the doctrine of equitable *vacatur* should be used only sparingly and only under three very specific factual scenarios.  Futility is not one of the grounds for *vacatur* set forth by the court in *Aqua Stoli*.  Indeed, none of the scenarios set forth above by the *Aqua Stoli* court involve the concept of

futility or make any reference to the comparative value of the Vessel and the competing claims.

Through their futility argument, the Vessel Interests ask this court to expand the basis for *vacatur* beyond those three scenarios expressly set forth by the *Aqua Stoli* court. This contention is at odds with the well-settled notion that admiralty courts have only limited equitable powers. *Id.* at 444. *See also Eddie S.S. Co. v. P.T. Karana Line*, 739 F.2d 37, 39 (2d Cir. 1984) ("[E]quity powers of an admiralty court remain severely circumscribed..."); *Schoenamsgruber v. Hamburg American Line*, 294 U.S. 454, 457-58 (1935) ("[w]hile courts of admiralty have capacity to apply equitable principles in order to better attain justice, they do not have general equitable jurisdiction").

**B.     *Coker* Is Bad Law.**

To support their argument that the Liquimar Plaintiffs' attachment is futile, the Vessel Interests rely on *A. Coker & Co., Ltd. v. Nat'l Shipping Agency Corp.*, 1999 WL 1009808 (E.D. La. 1999).  (ECF 32, at 5-6.)  This reliance is entirely misplaced.

*Coker* is an outlier in *vacatur* jurisprudence.  Moreover, the *Coker* opinion is entirely devoid of legal reasoning to support its futility point.  Indeed, in *Coker*, the court stated: "the legal issue here is whether the inverse order rule operates to determine the relative priorities of two maritime attachments issued under Rule B of the Supplemental Admiralty Rules."  Thus, the priority of claims, not futility, was the only issue the *Coker* court analyzed.

*Coker* simply invented the "futility" point five years before *Aqua Stoli*.  Tellingly, however, the *Aqua Stoli* court neither adopted the *Coker* holding nor even mentioned its existence.  So far as the Liquimar Plaintiffs can find, *Coker* has only been cited (on other

grounds) by two cases in the entire twelve years since it was decided, and it has never been cited for its futility holding.

Moreover, even if *Coker* were good law, which the Liquimar Plaintiffs deny, the facts of this case are clearly distinguishable. In *Coker*, an unreported decision, the Eastern District of Louisiana prohibited a second party from intervening to attach funds where it was certain (as opposed to possible) that the attached monies would be unable to satisfy the claim at issue. *Id.* at *3. Specifically, the plaintiff had attached funds in the amount of $99,020.14 and asserted a claim totaling $900,000.00. *Id.* at *1. A second plaintiff sought leave to intervene to assert a claim for $149,837.50. *Id.* The legal issue in the case was the priority of the claims. Because the attached funds were insufficient to cover even the first-priority claim, the court held (again, without legal analysis on the futility point) that intervention by the plaintiff with the second-priority claim would be denied. *Id.* at *3.

Here, unlike in *Coker*, the court is faced with a complex factual scenario involving multiple claimants and hotly disputed legal arguments regarding the priority of the competing claims. Although the Court has made proposed findings of fact with regard to the value of the ship and *custodia legis* costs, these numbers are admittedly mere estimates, and the Court has yet to rule on the priority of these claims. Moreover, the Court's finding with regard to the equitable subordination issue, which is currently being briefed, may completely uproot the current proposed ranking of claims.

In order to realize its function and purpose, a Rule B attachment must be enforceable. If this Court vacates the Liquimar Plaintiffs' attachment, thereby allowing Sanko to wriggle free of its financial responsibilities based on the futility concept set

forth only in the *Coker* decision, it would severely undermine the purpose of Rule B

attachment.   As stated by the Second Circuit in *Aurora Maritime Co. v. Abdullah*

*Mohamed Fahem & Co.*:

> [I]n light of the mobility of maritime defendants and their capital,
> permitting [state law] to trump Rule B attachments would undermine a
> rule upon which maritime actors rely…

85 F.3d 44, 48-49 (2d Cir. 1996) (internal quotations omitted).   Specifically, the Court's

decision on this issue could open the floodgates by creating an open invitation for every

ship owner whose vessel is attached to file a futility objection to any and all Rule B

attachments.   This would have the effect of encouraging post-attachment futility hearings

and could potentially lead to an outcome whereby all attachments are subject to "routine"

futility challenges.

### C.   This Court Should Not Conduct A Pre-Trial Of The Merits.

In order to sustain its maritime attachment under *Aqua Stoli*, a plaintiff need only

show that: (1) it has alleged a prima facie valid maritime claim against the defendant; (2)

the defendant cannot be found within the district; (3) the defendant's property may be

found within the district; and (4) no statutory or maritime law bar to the attachment

exists.  *Id.*  No party has claimed that the Liquimar Plaintiffs failed to make this showing.

A post-attachment Rule E(4) hearing is limited in scope and is *not* a miniature

pre-trial of the merits.   According to *Aqua Stoli*, a court should not undertake a fact

intensive inquiry in the context of a Rule E(4) challenge "because Rule B specifies the

sum total of what must be shown for a valid maritime attachment."   460 F.3d at 447.

Indeed, the *Aqua Stoli* court "reject[ed] the reasoning of the more recent district court

decisions that have engaged in a broader Rule E(4)(f) inquiry", including a *vacatur*

inquiry that would require and impose a "fact-intensive" inquiry at a Rule E(4) hearing. *Id.* at 445.   Similarly, in *Transportes Navieros Y Terrestes, S.A. DE D.V. v. Fairmount Heavy Transport N.V.*, the court held that "maritime plaintiffs are not required to prove their cases at [ ] a Rule E(4) hearing."  2007 WL 1989309, *3 (S.D.N.Y. 2007), *aff'd*, 572 F.3d 96 (2d Cir. 2009).

If the Vessel Interests were to prevail, and if the Court were to apply the standard they advocate, the Liquimar Plaintiffs' burden of proof would be akin to that of a party seeking a preliminary injunction.   Requiring the Liquimar Plaintiffs not only to prove a *prima facie* case for attachment but also to prove in advance that there will be adequate funds to satisfy their claim, would be tantamount to requiring the Liquimar Plaintiffs to prove likelihood of success, irreparable injury of party seeking relief, and lack of disproportionate injury to the opposing party, as in the context of a preliminary injunction. *See Blackwelder Furniture Co. v. Sellig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1997) (laying out necessary factors to establish need for a preliminary injunction).

This Court should not impose such an extreme burden on the Liquimar Plaintiffs. The Liquimar Plaintiffs have made a *prima facie* showing of their entitlement to and need for a Rule B attachment.  At this point in litigation, that is their only burden.

**D.     This Court Should Not Dissolve The Liquimar Plaintiffs' Attachment Based On The Mere Possibility That They Cannot Collect The Money They Are Owed.**

The Vessel Interests argue that the Court should throw out the Liquimar Plaintiffs' claims simply because BTMU and WBC *may* have superior liens that *may* leave nothing to satisfy the Liquimar Plaintiffs' claims.   As the Fifth Circuit has recognized in another context, however:

> [T]he *mere possibility* that a judgment debtor lacks the means to satisfy its
> monetary liability does not kill the issues in a case.  An indigent defendant
> otherwise could defeat any lawsuit simply by asserting that his poverty
> moots the claims against him.

*Ratner v. Sioux Natural Gas Corp.*, 770 F.2d 512, 516 (5th Cir. 1985) (emphasis added);

*see also National Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 489-90 (3rd Cir.

1992) (holding that a claim was not moot because the defendant would only "*possibly* [ ]

have assets to pay a small portion of the damages") (emphasis added).

Although *Ratner* and *National Iranian* arise in the bankruptcy context, their

holdings are persuasive under the facts at hand.  From a policy perspective, a court

should not prematurely dismiss a judgment holder's judgment or an attaching party's

attachment based solely on the possibility that the claimant cannot collect its debt.

Here, as in *Ratner*, the court is faced only with the "mere possibility" that the

Vessel will yield insufficient funds at interlocutory sale to cover the Liquimar Plaintiffs'

claims.  At this point in litigation, no party can know how much the Vessel will obtain at

auction, and any estimates are and will continue be just that until the sale is complete.

The Vessel Interests contend that the Court should vacate the Liquimar Plaintiffs'

claims based on a hypothetical whereby the Vessel sells at auction, BTMU and the *in rem*

claimants are all able to prove their claims, and the Liquimar Plaintiffs are unable to

collect any money.  In the same breath, however, the Vessel Interests admit that this

hypothetical will never come to pass.  If this Court vacates the Liquimar Plaintiffs'

attachment, then WBC and BTMU will dismiss their claims, and the Vessel will sail,

encumbrance free.  By arguing for *vacatur* based on a hypothetical which they control

and which know will never come to fruition, the Vessel Interests attempt to make an end

run around the Liquimar Plaintiffs' valid and proper Rule B attachment.

7

## II.    THE CHOICE-OF-LAW PROVISION IN THE WBC CHARTER PARTY GOVERNS, AND WBC HAS NO MARITIME LIEN.

Clause 60 of the Charter Party between WBC and Sanko dated March 16, 2012 (the "WBC Charter Party") provides:

> Arbitration in London and Standard Bimco Dispute Resolution Clause for London Arbitration under English Law including LMAA Small Claims.

This express English choice-of-law clause governs.  Under English law, WBC would have no maritime lien.

### A.    Under English Law, WBC Would Have No Maritime Lien.

It is axiomatic that English law does not recognize maritime liens for breach of charter party, and United States courts will not recognize a maritime lien where English law controls. *Bominflot, Inc. v. M/V HENRICH S*, 465 F.3d 144, 147 (4th Cir. 2006); *Hiedmar v. Anomina*, 993 F.Supp. 990, 994 (S.D. Tex. 1997), *vacated on other grounds*, 132 F.3d 264 (5th Cir. 1998)). *See also* Affidavit of Benjamin Parker, Barrister, ECF 90, Exhibit 1.  *Accord,* WILLIAM TETLEY, MARITIME LIENS AND CLAIMS 732 (2d Ed. 1999) ("A charterer does not have a maritime lien in the U.K.").  Thus, under English law, WBC has no maritime lien against the Vessel, no Rule C right of arrest, and has no claim that primes that of the Liquimar Plaintiffs.

### B.    The Purported Addendum To The WBC Charter Does Not Foreclose The Liquimar Plaintiffs' Attachment.

Knowing that under English law WBC would have no maritime lien under the WBC Charter Party as it existed at the time of the Liquimar Plaintiffs' attachment, Sanko and WBC set out to manipulate the WBC Charter Party *ex post facto* by executing an addendum dated May 24, 2012 (the "Addendum") intended to, *nunc pro tunc*, foreclose the Liquimar Plaintiffs' legitimate right to attachment.

Specifically, the Addendum attempts to strike the English choice-of-law provision and replace it with a U.S. choice-of-law provision. No ship owner acting in a commercially reasonable fashion would change a charter party to grant the charterer a lien on a vessel for breach of the charter party. However, this is exactly what WBC and Sanko purport to have done with their post-attachment Addendum. Tellingly, WBC and Sanko executed the Addendum (under which U.S. law allegedly governs) on May 14, 2012, *the same day* WBC moved to intervene in this litigation and one week after the Liquimar Plaintiffs' attachment was served. This timing was no coincidence.

Through testimony at the hearing on June 21, 2012, Sanko's witness, Mr. Jagoe, admitted that the only reason he signed the after-attachment Addendum was because counsel for Sanko asked him to do so. (Transcript, M-I-171-72.) Similarly, the WBC witness, Mr. Tungland, admitted that he had no part in negotiating or executing the Addendum (despite being in charge of WBC's steel operations) and that the Addendum was signed only by WBC in-house counsel in Oslo. (Transcript, M-I-102, 125.) This testimony suggests that Sanko and WBC executed the Addendum in a transparent attempt to cook up a maritime lien after the fact.

**C.     Under *Triton*, The English Choice-of-Law Provision Governs.**

A plain reading of the WBC Charter Party's clear and deliberate choice-of-law provision, as it existed at the time of the Liquimar Plaintiffs' attachment, indicates that English law applies.

In *Triton Marine Fuels Ltd., S.A. v. Bridge Oil, Ltd.*, the leading Fourth Circuit case on choice-of-law under federal maritime law, the court held that "absent a compelling reason of public policy, a freely negotiated choice-of-law clause in a

maritime contract should be enforced." 575 F.3d 409, 413 (4th Cir. 2009). *See also M/S BREMEN v. Zapata Off-Shore Company*, 407 U.S. 1, 12-13 (2009) ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect."); *Lauritzen v. Larsen*, 345 U.S. 571, 588-89 (1953) ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."). In *Triton*, a Canadian corporation and a Cayman Islands corporation entered into a contract with a U.S. choice-of-law clause. The *Triton* court enforced the parties' choice-of-law clause and applied U.S. law. 575 F.3d at 413-16.

> Similarly, in *Ryan-Walsh, Inc. v. M/V OCEAN TRADER*, this Court held that:

> It is clear [ ] that the agreements of private parties, whether freely negotiated or not, are ordinarily to be given full effect by federal courts. Accordingly, choice of law and choice of forum provisions in admiralty contracts have generally been held to be enforceable.

930 F.Supp. 210, 219 (D.Md. 1996) (extensive citation omitted). *See also Bominflot, Inc. v. M/V HENRICH S*, 465 F.3d 144, 148 (4th Cir. 2006) ("Because no `other law' is specified on the face of the contract, and public policy does not counsel against it, we will respect the parties' intentions and apply English law."); *Wave Maker Shipping Co., Ltd. v. Hawkspere Shipping Co., Ltd.*, 2003 WL 152834, *1 (2003) (court applied English law without question based on an English choice-of-law provision in the charter party).

Here, as in *Triton*, the WBC Charter Party demonstrates the unmistakable intent of both Sanko and WBC that the agreement be governed by English, not American law. Clause 60 of the WBC Charter Party provides:

Arbitration in London and Standard Bimco Dispute Resolution Clause for London Arbitration under English Law including LMAA Small Claims.

Further, the standard form of charter party, calling for general average to be adjusted in New York is crossed out, with "New York" replaced by "London."

### D.    Under *Lauritzen*, The English Choice-of-Law Provision Would Also Govern.

"In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen* [ ] and its progeny." *Triton*, 575 F.3d at 413 (quoting *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997)).   In *Lauritzen v. Larsen*, the Supreme Court enumerated seven factors that bear on a choice-of-law analysis and apply in context of a maritime action: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of the foreign forum; and (7) the law of the forum. 345 U.S. 571, 583-90 (1953).

Here, even under the factors set forth in *Lauritzen*, there is no basis for applying U.S. law over English law.  The Vessel flies a Japanese flag.  Sanko, the owner of the Vessel, is Japanese.  WMC, the charterer, is Norwegian.  The WBC Charter Party was made in Greece and Norway.   Performance under the WBC Charter Party was worldwide.  A foreign forum would be no less accessible; indeed, depending on the forum, it may be more accessible.  And here, most importantly, the law of the forum expressly acknowledges that the choice-of-law clause invoking English law is valid.

**E.      Even Assuming, *Arguendo*, That This Court Were To Disregard *Triton*, WBC Would Have No Maritime Claim.**

Even if this Court were to disregard *Triton* and its admonition that the parties' choice-of-law provision should prevail, there would be no basis for a conclusion that U.S. law should govern.   Under U.S. law, maritime liens are *stricti juris* and may not be created by agreement between the parties.   Therefore, WBC and Sanko cannot create a maritime lien on the Vessel simply by amending the WBC Charter Party with a U.S. choice-of-law clause.

As specifically stated by the Fourth Circuit, "maritime liens are '*stricti juris*,' and *cannot be created by agreement* between the parties." *Bominflot*, 465 F.3d at 146-47 (emphasis added). *See also The Steamship Yankee Blade*, 60 U.S. 82, 89 (1856) (holding that maritime liens are "'*stricti juris*' and cannot be extended by construction, analogy, or inference").

Here, under the facts at hand, recognizing WBC and Sanko's U.S. choice-of-law clause would allow them to do indirectly what they could not do directly. Therefore, the Addendum is unenforceable to "undo" the Liquimar Plaintiffs' attachment.   To enforce the Addendum would allow WBC and Sanko to create a maritime lien through contract (without consideration) in the face of litigation, and effectuate an end run around the Liquimar Plaintiffs' valid and proper Rule B attachment.

**F.   WBC's Claim Is Unripe.**

Under English or U.S. law, WBC's claim is premature.  According to black letter law in both England and the U.S., an indemnity claim does not accrue until payment is made.

Under English law, WBC's claim is unripe.  In *Bottiglieri Di Navigazione SPA v. Tradeline LLC*, the Second Circuit affirmed the district court's finding that:

> [P]laintiff's claim for indemnity against defendant was unripe (and therefore not a valid *prima facie* claim) because plaintiff had yet to incur liability to the third-party owner of the vessel in question and, under English law, a claim for indemnity does not accrue until a plaintiff has actually made a payment to the third party.

293 Fed.Appx. 36, 27, *1 (2d Cir. 2008).  *See also Aosta Shipping Co. Ltd. v. OSL S.S. Corp.*, 594 F.Supp.2d 296, 397-99 (S.D.N.Y. 2009), *vacated on other grounds, Aosta Shipping Co. Ltd. v. OSL S.S. Corp.*, 350 Fed.Appx. 505 (2d Cir. 2009) (holding that under English law, a claim for indemnity does not ripen until the claim is paid).

Under U.S. law, WBC's claim is similarly unripe.  As stated in *Intel Containers International Corp. v. Atlanttrafik Express Service Ltd.*, a maritime lien is:

> a special property right in the vessel, arising in favor of the creditor by an operation of law as security for a debt or claim.  The lien arises when the debt arises….

982 F.2d 765, 766 (2d Cir. 1992) (quoting *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir. 1986)).

Here, WBC has merely put forth estimates of what damages it will incur as a result of the Liquimar Plaintiffs' attachment of the Vessel.  To date, to the Liquimar Plaintiffs' knowledge, WBC has not actually incurred any costs.

## III.   <u>EQUITABLE SUBORDINATION.</u>

The Liquimar Plaintiffs herewith adopt and incorporate by reference the submission of Knightsbridge Tankers Limited on this issue.

_/s/_
Geoffrey S. Tobias, Trial Bar No. 301
Caitlin Q. Vandevander, Trial Bar No. 29620
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
100 Light Street
Baltimore, Maryland 21202
Phone: 410-347-7339
Fax: 443-263-7539

_Attorneys for Evridiki Navigation Inc, et al._
