**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|   |   |   |
|---|---|---|
| | * | |
| **EVRIDIKI NAVIGATION, INC.,** *et al.*, | * | |
| **Plaintiffs** | * | |
| **v.** | * | **CIVIL No. JKB-12-1382** |
| **THE SANKO STEAMSHIP CO., LTD.,** *et al.*, | * | |
| | * | |
| **Defendants** | * | |
| *   *   *   *   *   *   * | *   *   *   *   * | |

**MEMORANDUM and ORDER**

In this maritime dispute, Plaintiffs Liquimar Tanker Management, Inc. and Knightsbridge

Tankers, Ltd. obtained attachments of the vessel M/V SANKO MINERAL, pursuant to Rule B of

the SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS of the FEDERAL RULES OF CIVIL

PROCEDURE.   Now pending before the Court is a motion (ECF No. 32) by intervening Plaintiff

Western Bulk Carriers to vacate those attachments.   The issues have been briefed and a hearing has

been convened.   Local Rule 105.6.   For the reasons explained below, the motion will be

GRANTED.

**I.        BACKGROUND**

The primary defendant in this case, Sanko Steamship Co. ("Sanko"), is one of Japan's oldest

and largest steamship companies.   Since 2008, Sanko's business has been badly affected by a

decreased rate of growth in the demand for dry bulk shipping, allegedly caused by the global

financial crisis.   Between 2008 and 2012, Sanko engaged in a number of efforts to restore its

financial condition, including selling unnecessary assets and reducing the size of the company and

its expenses.  One such effort involved unilaterally "suspending" or "deferring" the payment of charter hire (*i.e.* lease payments) that it owed with respect to certain of its vessels.  These measures proved insufficient, however, and in March of 2012, Sanko began a private ADR process ("Turnaround ADR") with its primary creditors in Japan.  But, this too proved unsuccessful and in July of 2012, Sanko filed a petition in the Tokyo District Court for reorganization under the Japanese Corporate Reorganization Act.    At the same time, it filed a petition in the Bankruptcy Court for the Southern District of New York, under Chapter 15 of the U.S. Bankruptcy Code, for recognition of the Japanese bankruptcy as a "foreign main" bankruptcy proceeding. (Correspondence re: SANKO BANKRUPTCY PROCEEDINGS, ECF No. 120).

This case arises out of competing claims by various creditors against Sanko and its vessel, the M/V SANKO MINERAL ("MINERAL" or "the Vessel"), which is presently attached and arrested in the Chesapeake Bay, near Baltimore Harbor, in the District of Maryland.  There are two groups of plaintiffs.  The first group, (hereinafter referred to as "Attaching Plaintiffs"), consists of foreign shipping corporations who allege that they have leased vessels to Sanko for which Sanko has "deferred," *i.e.* refused to pay, the charter hire that is due under the lease agreements.  These include three managee navigation companies of the Greek corporation, Liquimar Tanker Management ("Liquimar"), and a Bermuda corporation, Knightsbridge Tankers, Ltd. ("Knightsbridge").  Liquimar, the original plaintiff in this case, filed a complaint (ECF No. 1) seeking attachment of the MINERAL on May 7, 2012, shortly after it sailed into Baltimore Harbor. The Court issued a writ of maritime attachment and garnishment (ECF No. 5), which was executed by the United States Marshal the same day.  Knightsbridge filed an intervening complaint and request for attachment shortly thereafter.  (ECF Nos. 15 & 16).

The second group of plaintiffs consists of various foreign and domestic businesses with interests in the MINERAL.  One of these is the Norwegian corporation, Western Bulk Carriers, AS ("WBC"), which is the entity responsible for chartering the MINERAL's voyage.  Another is the Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo-Mitsubishi" or "the Bank"), which holds a foreign preferred ship's mortgage on the MINERAL.  The others are all owners of cargo (shipments of silicone manganese and various steel products) that the MINERAL was chartered to ship from ports in Bulgaria and Turkey to ports in Houston and New Orleans.  Those parties are the Delaware corporations ThyssenKrupp Materials NA, Inc. ("ThyssenKrupp") and Glencore, Ltd. ("Glencore"), the Texas corporations Sunbelt Group, LP ("Sunbelt") and Salzgitter Mannesmann International USA ("Salzgitter"), the Canadian corporation IMCO International, Inc. ("IMCO"), and the Turkish corporation Borusan Mannesmann Boru Sanayi Ve Ticaret AS ("Borusan").  With the exception of the Bank of Tokyo-Mitsubishi, (which has intervened in the action but has not asserted a claim), each of these parties has intervened in this case primarily to assert *in rem* claims against the MINERAL arising out of her failure to deliver the cargo to the destination ports in Houston and New Orleans.[1]

When the first complaint was filed in this case, Sanko was still engaged in the voluntary Turnaround ADR process in Japan.  Allegedly, as part of that process, Sanko had to pledge to the participant creditors that it would not take any action that would favor any creditor over another.  This pledge extended even to creditors who were not participants in the ADR process.  Therefore, when Sanko learned that its vessel had been attached in Baltimore by Liquimar to secure Liquimar's claim for unpaid charter hire, Sanko refused to post a bond to obtain the Vessel's release, as it believed that doing so would violate its pledge to treat all of its creditors equally.  (Dec. of Clifford C. Jagoe at ¶¶ 4, 5, ECF No. 50-1, Ex. A).

---

[1] Some of the parties have asserted other claims as well, but they are not significant for purposes of this motion.

As a result of Sanko's refusal to post a bond, the MINERAL remained attached in the District of Maryland while Liquimar's claim proceeded in this Court. As noted above, Knightsbridge quickly moved to intervene in the action and obtained its own attachment of the MINERAL.[2] The expectation of the Plaintiffs at this time was that, in the event they obtained a judgment on their claims against Sanko for unpaid charter hire, this Court would sell the MINERAL and use the proceeds to satisfy those judgments.

The next plaintiff to intervene was WBC. Its complaint (ECF No. 21), filed about two weeks after the initial attachment of the MINERAL, alleged that it had contracted with Sanko to charter the MINERAL's present voyage and that, under the charter, Sanko was obligated to secure the MINERAL's release in the event that she was arrested or attached. WBC claimed that it had demanded that Sanko honor this obligation and post a bond to release the Vessel from its attachment in this District, but that Sanko had refused. The complaint further alleged that WBC owed contractual obligations to third parties to insure that the MINERAL delivered her cargo in a timely manner, and that it had already begun to receive damage claims from those parties due to the delay caused by the attachment. WBC claimed that Sanko's alleged breach of the charter entitled it to a maritime lien against the MINERAL, and it therefore moved that the Court issue a warrant for the arrest of the MINERAL *in rem*, pursuant to Supplemental Admiralty Rule C. The Court granted the motion and issued a warrant for the MINERAL's arrest. (ECF Nos. 24 & 26).

About a week later, WBC filed the motion that is the subject of this memorandum, styled Emergency Motion to Vacate Attachments and/or For Order Directing Cargo be Discharged (ECF No. 32). In the accompanying brief, WBC argued that the attachments of the MINERAL that Liquimar and Knightsbridge had obtained under Supplemental Rule B should be vacated because

---

[2] As requested in the motion to intervene (ECF No. 15), the Court accepted Knightsbridge's Intervening Complaint (ECF No. 16) as sufficient process of maritime attachment and garnishment and waived physical service by the Marshal.

they were futile.  Specifically, WBC argued that, in the event of a judicial sale of the MINERAL, its own claim against Sanko for breach of the charter agreement and the mortgage on the MINERAL held by the Bank of Tokyo-Mitsubishi would each take priority over the claims of Liquimar and Knightsbridge, and that they would exhaust all of the proceeds from the sale.  Thus, WBC concluded, even if Liquimar and Knightsbridge obtained judgments on their claims and forced a judicial sale of the MINERAL, they would not receive any of the proceeds and their judgments would go unsatisfied.  WBC argued that it would be inequitable to continue to detain the MINERAL when doing so could not provide the Attaching Plaintiffs with any security for their claims, and urged the Court to vacate the attachments on those grounds.[3]

The Court held an emergency hearing on WBC's motion on May 31 that included, among other things, an impromptu settlement conference with Chief Magistrate Judge Grimm.  The parties were unable to reach a settlement, however, and the Court determined that further briefing would be needed on the legal issues raised in WBC's motion before the Court would be prepared to enter a ruling.  The Court therefore entered an order (ECF No. 36) giving the parties three weeks to submit briefs on the relevant issues and giving WBC an additional week after that to file a response.

A few days later, on June 5, ThyssenKrupp filed an intervening complaint (ECF No. 40) against Sanko, WBC, and the MINERAL *in rem* for alleged damages arising from the MINERAL's failure to deliver cargo belonging to ThyssenKrupp, which it had contracted to sell to buyers in the U.S. by a specified time, which had, by then, passed.  ThyssenKrupp sought both Rule B attachment and Rule C arrest of the MINERAL, which the Court granted.  (Order at ¶1, ECF No. 67).

On June 7, WBC filed a second emergency motion (ECF No. 44), this time urging the Court to reconsider the four week briefing schedule that it had ordered with respect to the motion to vacate

---

[3] WBC advanced a second argument with respect to the Knightsbridge attachment and also requested that the Court order the MINERAL's cargo to be discharged if it did not vacate the attachments, but this is no longer relevant.

the attachments.  WBC argued that it would be inequitable to continue to detain the MINERAL for that long, thereby allowing inevitable damages to accrue from non-delivery of the cargo.  The Court therefore set in a second hearing for June 12 to determine whether the briefing schedule could reasonably be expedited.  At the hearing, the Court found that it might be possible to decide the motion more quickly, but that, to do so, it would have to make findings of fact on a number of contested issues, which would likely require further hearing.  After discussing several scheduling options with the parties, the undersigned referred the matter to Chief Magistrate Judge Grimm, pursuant to 28 U.S.C. § 636, with instructions to conduct an evidentiary hearing on June 21 (when the undersigned was unavailable), and to make proposed findings of fact and a recommendation for the disposition of WBC's motion.  (*See* ORDER referring case, ECF No. 66).

On the same day, the case was joined by two additional parties: a new plaintiff, Glencore, which filed an intervening complaint (ECF No. 56) against the MINERAL, *in rem*, for failure to deliver cargo; and the Bank of Tokyo-Mitsubishi, whose U.S. counsel entered appearances on its behalf.  (ECF Nos. 53 & 54).  Shortly thereafter, but before the evidentiary hearing, another four plaintiffs (Sunbelt, IMCO, Salzgitter, and Borusan, collectively "Borusan Plaintiffs") filed intervening complaints (ECF Nos. 75, 76, 77, & 78) claiming interests in the MINERAL's cargo.  Glencore and the Borusan Plaintiffs all moved for arrest of the MINERAL *in rem* pursuant to Supplemental Rule C.  The Court granted these motions and issued warrants (ECF Nos. 68 & 84) for the MINERAL's arrest.[4]  The following day, the Bank filed a motion to intervene (ECF No. 80) and an intervening complaint (ECF No. 81), seeking a declaratory judgment of the validity of its mortgage.

At the evidentiary hearing, beginning on June 21, Chief Magistrate Judge Grimm heard testimony and received evidence relating to the value of the MINERAL, her likely sale price at a

---

[4] Physical service of the warrants was waived.

judicial sale, the custodial costs associated with the sale, the cost to discharge and transship the cargo, the validity and amount of the Bank's mortgage, and the amount of each party's claim.  At the end of the hearing, on June 22, Judge Grimm found, among other things, that: (1) the MINERAL would sell for between $16 million and $17 million at a judicial sale; (2) the Bank of Tokyo-Mitsubishi held a valid and properly recorded foreign preferred ship's mortgage on the MINERAL with $15.9 million outstanding; (3) the cost of discharging the cargo would be over $1 million; and (4) the cargo parties' damage claims for loss of market value of the cargo alone totaled almost $5 million.  (*See* Chart of Factual Findings, ECF No. 95-1, Attach. 1).

After receiving Judge Grimm's proposed findings of fact, the Court entered an order (ECF No. 97) apprising the parties of its provisional view that, if it were to adopt those findings and apply ordinary rules of priority (under which the mortgage and the *in rem* claims would prime the *in personam* claims of the Attaching Plaintiffs), then the Rule B attachments would indeed be futile. The Court therefore ordered the parties to submit briefs on an expedited schedule, addressing legal challenges that the Attaching Plaintiffs had raised but that were not addressed at the evidentiary hearing.  Specifically, the parties were ordered to brief three issues: (1) whether this Court possessed equitable authority to vacate the attachments on the grounds of futility; (2) whether WBC possessed a valid maritime lien; and (3) whether the Bank's mortgage should be "equitably subordinated" to other claims due to the Bank's alleged "control" of Sanko through the ADR process.

The parties filed their initial briefs by June 28, as ordered.  But, on July 2, three days before the final response briefs were due, counsel for WBC filed correspondence (ECF No. 114) apprising the Court and the parties that it had learned that the Turnaround ADR process had been abandoned and that Sanko had filed a formal bankruptcy petition in the Tokyo District Court under the

Japanese Corporate Reorganization Act.  The letter also stated that Sanko had filed a petition in the U.S. Bankruptcy Court for the Southern District of New York under Chapter 15 of the U.S. Bankruptcy Code, seeking recognition of the Japanese reorganization proceeding as a "foreign main" bankruptcy proceeding.  The following day, counsel for Knightsbridge filed correspondence (ECF No. 118), informing the Court that the New York Bankruptcy Court had issued a temporary restraining order (ECF No. 118-1, Ex. 1) enjoining all creditors from taking or continuing any action against Sanko or its assets.  In view of this, the Court suspended the briefing schedule with respect to WBC's motion to vacate the attachments.

On July 5, the Court received correspondence (ECF No. 120) from counsel for Hishashi Asafuji, Sanko's appointed Foreign Representative in the New York bankruptcy proceedings.  The letter explained that the TRO entered by the Bankruptcy Court expressly allowed the Foreign Representative to waive its protections with respect to WBC's pending motion in this Court, but that the Foreign Representative had not yet made the decision to do so.  The Court held a telephone conference with counsel for all parties later that afternoon, but little information was exchanged beyond that contained in the letter.  As the TRO was then still in effect with respect to this case and WBC's motion, the Court allowed the briefing schedule to remain suspended.

On July 10, the Court received correspondence (ECF No. 121) indicating that the Foreign Representative had decided to waive the protections of the TRO with respect to WBC's motion, but that the New York Bankruptcy Court was scheduled to hold a hearing the following day to consider whether it should extend the protections of the TRO by entering a preliminary injunction.  Certain parties expressed concern that the preliminary injunction, if issued, might not contain the same carve-out for the WBC motion as did the TRO.  The following evening, however, the parties submitted a joint status report (ECF No. 124), indicating that the New York Bankruptcy Court had

issued a preliminary injunction which did contain the carve-out.[5]  The Court therefore reinstated briefing on WBC's motion and ordered final response briefs to be filed by July 16.  Those briefs have now been submitted and the motion is ripe for decision.

## II.      LEGAL STANDARD

Whenever property is attached under Supplemental Admiralty Rule B, Supplemental Rule E(4)(f) allows any party claiming an interest in the property to obtain a prompt hearing at which the attaching plaintiff must bear the burden of showing that the attachment is proper.  *See* FED. R. CIV. P. SUPP. ADM. RULE E(4)(f); *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006), *abrogated on other grounds.*  Specifically, the attaching plaintiff must show that it has complied with all of the filing and service requirements of Rules B and E, and, in addition, that: "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment."  *Id.* (footnote omitted).  Furthermore, according to the Second Circuit, a district court possesses authority in certain circumstances to vacate attachments on equitable grounds even if the attachments were properly obtained under Rules B and E.  *See id.*  Although the precise scope of this authority is not well-defined, it allows a district court, at the very least, to vacate otherwise valid attachments if: "1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise."  *Id.* (footnote omitted).  The defendant bears the burden of establishing these conditions.

---

[5] Importantly, the scope of the carve-out was strictly limited to resolution of WBC's motion to vacate the Rule B attachments (ECF No. 32); under both the initial TRO (ECF No. 118-1, Ex. 1) and the subsequent preliminary injunction (ECF No. 126-3, Ex. C), all other aspects of this case related to Sanko or the MINERAL were stayed.

### III.   ANALYSIS

When WBC filed this motion on May 30, 2012, the state of this case was very different than it is now.   At that time, Sanko was still attempting to rehabilitate itself through a private ADR process with its primary creditors in Japan.   Because that process was entirely voluntary, it posed no obstacle to a non-participant creditor's pursuing maritime claims against Sanko in courts anywhere in the world.   There was thus nothing to prevent this Court from exercising jurisdiction over Sanko's assets and, if necessary, liquidating those assets in order to satisfy judgments it might award to creditors like Liquimar or Knightsbridge.   It was on the basis of that possibility that the attachments of the MINERAL were issued.   WBC's challenge to the Rule B attachments was based on the argument that, even if the Attaching Plaintiffs obtained judgments for the full amount of their claims and a judicial sale of the MINERAL, they would never receive satisfaction of the judgments, because all of the proceeds from the sale would be exhausted in satisfying the claims of other creditors with a higher priority.

Since WBC filed its motion, however, the facts have changed.   Sanko has now filed a formal bankruptcy petition in Japan, seeking a Debtor-in-Possession ("DIP") type reorganization under the Japanese Corporate Reorganization Act.   (*See* Tokyo District Court Decision, ECF No. 126-2, Ex. B; Briefing Meeting for Creditors, ECF No. 129-1, Appendix A).   It has also filed a petition under Chapter 15 of the U.S. Bankruptcy Code in the Bankruptcy Court for the Southern District of New York, seeking recognition by that court of the Japanese bankruptcy as a "foreign main" bankruptcy proceeding.   (*See* Preliminary Injunction Order, ECF No. 126-3, Ex. C).   Both efforts have met with initial success.   The Tokyo District Court has granted Sanko's petition for reorganization[6] and has issued an order enjoining any proceedings against Sanko or its assets.   (*See* Tokyo District Court

---

[6] This fact was disclosed by Sanko's counsel off the record during a telephone conference with the Court and all counsel on July 23, 2012.

Decision, ECF No. 126-2, Ex. B).   The New York Bankruptcy Court has issued a preliminary injunction, staying all proceedings against Sanko and its assets in the U.S. while it further considers Sanko's Chapter 15 petition, which it has found has a "substantial likelihood of success on the merits." (Preliminary Injunction Order at 2).[7]

The effect of these developments has been to moot any consideration of the likely outcome of a judicial sale of the MINERAL, since it is no longer in the Court's power to sell the MINERAL or adjudicate the parties' underlying claims.   The Attaching Plaintiffs implicitly concede this;[8] indeed, they attempt to turn it to their advantage by arguing that since WBC's original futility argument has been mooted, the Court should therefore deny its motion to vacate the attachments. But, that argument does not withstand scrutiny.   The bankruptcy proceedings have indeed mooted the original grounds of futility that WBC advanced in support of its motion, but in doing so they have rendered the attachments futile in an even more fundamental way.

The process of maritime attachment serves two purposes.   First, it allows a creditor to obtain *in personam* jurisdiction over a debtor *via* his property and to secure his appearance in court to answer the creditor's claims.   *See STX Panocean (UK) Co., Ltd. v. Glory Wealth Shipping Pte Ltd.*, 560 F.3d 127, 130 (2d Cir. 2009).   Second, it gives the attaching plaintiff security that can be used to satisfy any judgment he might obtain in the action.   *Id.*   Further detention of the MINERAL in this district, however, cannot possibly achieve either of these objectives.   As explained below, any power that the Rule B attachments in this case may once have had to effect these purposes has been, or almost certainly soon will be, eviscerated completely by Sanko's bankruptcy.

---

[7] Also during the July 23, 2012 telephone conference, the parties apprised the Court that the New York Bankruptcy Court will hold a hearing beginning August 8, 2012 to take up its final ruling on the Chapter 15 petition.

[8] (*See* Knightsbridge's Reply Memorandum at 4-5 (ECF No. 129) ("The Bankruptcy Court's preliminary injunction order dated July 11, 2012 precludes BTMU from foreclosing on its ship mortgage, contrary to the "futility" argument's assumption."); Liquimar's Memorandum at 3 (ECF No. 126) ("It is clear that none of the plaintiffs here will be permitted (absent order of the Japanese and U.S. bankruptcy courts) to go forward to sell the Vessel and seek a distribution of proceeds by this Court.")).

First, the attachments can no longer secure this Court's jurisdiction over Sanko because the underlying action has been stayed by order of the New York Bankruptcy Court.  At present, that stay is only preliminary in nature; but, if the Bankruptcy Court grants Sanko's Chapter 15 petition and recognizes the Japanese reorganization as a "foreign main" bankruptcy proceeding, which there is every indication that it will,[9] then the stay of actions against Sanko and its assets in the U.S. will become mandatory under Chapter 15 and will go into automatic effect without any further order of the Bankruptcy Court, presumably until the foreign reorganization is concluded.  *See* 11 U.S.C. §§ 362 & 1520.  Thus, since the reorganization plan includes the comprehensive discharge of all charter hire claims against Sanko, such as those advanced by the Attaching Plaintiffs in this case,[10] it appears inevitable that those claims will never be adjudicated in this Court, regardless of whether or not the attachments are sustained.

Second, for all of the reasons just stated, the attachments can also no longer give the Attaching Plaintiffs any security for their claims.  The Court does not now have, and, in all probability, will never have, the ability to sell the MINERAL or to convey any interest in her to the Attaching Plaintiffs.  Again, the Attaching Plaintiffs appear to recognize this,[11] but one of them (Liquimar) nevertheless urges the Court not to vacate the attachments because it believes that by maintaining its attachment it will gain the status of a secured creditor for purposes of the reorganization.  (Liquimar's Reply Memorandum at 3, ECF No. 126).  That, however, is not a reason for encumbering a major revenue-generating asset of a business whose successful reorganization (and equitable disposition of its debts) turns on its ability to stay financially afloat.

---

[9] No party has suggested that there is any likelihood of the petition's being rejected.  Indeed, the preliminary injunction order itself contains a finding by the Bankruptcy Court that the petition has a high likelihood of success on the merits; and, that likelihood has since been reinforced by Tokyo District Court's formal granting of Sanko's reorganization petition.

[10] (*See* Briefing Meeting for Creditors at 7, ECF No. 129-1, Appendix 1).

[11] *See* n.9, *supra*.

*See In re Atlas Shipping A/S*, 404 B.R. 726, 742 (Bankr. S.D.N.Y. 2009) (writing, after vacating Rule B attachments, that fact that attaching parties "may be denied an advantage over the debtor's other previously unsecured creditors is not a valid reason to deny relief to the foreign representative."). Rather, if the Attaching Plaintiffs are entitled to any advantage for having obtained their attachments prior to commencement of the reorganization, any decision to that effect is properly left to the court in Japan. *See CSL Australia Pty. Ltd. v. Britannia Bulkers PLC*, No. 08 Civ. 8290(PKL), 2009 WL 2876250 at *5 (S.D.N.Y. Sept. 8, 2009) ("[I]t is appropriate for the Danish Court to determine what benefit, if any, [plaintiff] should enjoy from having obtained the Rule B attachment in this District.") (citing *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 715 (2d. Cir. 1987)). The attachments in this case are now a matter of judicial record and the Attaching Plaintiffs will be free to argue their significance when their claims are taken up in the reorganization proceedings. This Court finds it unlikely in the extreme that the success or failure of any such argument could be affected by whether or not the attachments are still in some sort of fictitious "effect" at that time, which is all that could be accomplished by maintaining them beyond this point.

For all of these reasons, the Court has, after careful consideration, concluded that any further attachment of the MINERAL in this district would be both futile and inequitable. The only question that remains is whether the Court possesses the authority to vacate the attachments on these grounds. For the reasons explained below, the undersigned finds that it does.

The Second Circuit has long held that district courts sitting in admiralty possess "inherent power to adapt an admiralty rule to the equities of a particular situation," and that this power is "entrusted to the sound discretion of the district judge sitting as an admiralty judge." *See Greenwich Marine, Inc. v. Alexandra*, 339 F.2d 901, 905 (2d. Cir. 1965). The leading case on the

application of this equitable discretion in the context of a Rule B attachment is *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2nd Cir. 2006).   There, the Second Circuit reasoned that because Rule B was deliberately drafted to make the remedy of attachment widely and easily available, a district court's discretion to vacate attachments should be limited.   While *Aqua Stoli* did not attempt to define the exact scope of a district court's equitable powers in this respect, it did set out three non-exclusive examples of instances where equitable vacatur of a Rule B attachment would be appropriate.   Those were: (1) where the defendant is subject to *in personam* jurisdiction in a convenient adjacent district; (2) where the defendant is subject to *in personam* jurisdiction in a district where the plaintiff is also present; and (3) where the plaintiff has already obtained adequate security for his claims elsewhere.   *Id*. at 445.

In briefing the instant motion, the Attaching Plaintiffs have argued that vacating a Rule B attachment on grounds of futility would be a radical departure from the narrow allowances for equitable vacatur prescribed in *Aqua Stoli*.   The Court does not agree.   Indeed, the Court finds that futility of the kind with which it is confronted in this case is a far more conservative ground for vacatur than what *Aqua Stoli* condoned.   Under that case, an attachment may be vacated based on an equitable judgment that, because of a plaintiff's access either to jurisdiction in another convenient forum or to other security, his interest in the jurisdiction and security that would be conferred by the attachment is not strong enough to outweigh the defendant's interest in the use of his property. When an attachment is truly futile, *i.e.*, when it cannot provide jurisdiction or security for the plaintiff's claim, then the plaintiff's interest in it is even less than in the scenarios described in *Aqua Stoli*, though the defendant's property interest may be just as strong.   In this case, Sanko's interest in regaining the use of its vessel to generate revenue to be distributed to creditors in a reorganization proceeding carries an equitable weight that is even greater than the average defendant's interest in

the free use of his property.  Thus, in the situation presented in this case, the Attaching Plaintiffs' interests in maintaining the attachments are less, and the defendant's interests in vacating them greater, than in the situations where *Aqua Stoli* found equitable vacatur to be appropriate.

For these reasons, the Court is confident that, sitting as a court of admiralty, it possesses the equitable discretion to vacate the Rule B attachments in this case on the grounds set forth above.

## IV.    ORDER

Accordingly, it is ordered that:

(1)    WBC's Emergency Motion to Vacate Attachments (ECF No. 32) is GRANTED;

(2)    The process of maritime attachment and garnishment previously issued by this Court in favor of the Liquimar companies (ECF No. 5) and Knightsbridge (ECF No. 18)[12] pursuant to Supplemental Admiralty Rule B with respect to the Vessel M/V SANKO MINERAL is VACATED;[13]

(3)    This order shall be STAYED for a period of three business days from the date of its issue;

(4)    The referral to Chief Magistrate Judge Grimm is TERMINATED and the Court takes no action with respect Judge Grimm's proposed findings of fact and recommendation for disposition of this motion, as the issues addressed therein have been RENDERED MOOT by the subsequent bankruptcy proceedings; and

---

[12] The Court's Order (ECF No. 18) is VACATED only to the extent that it orders the issuance of process of maritime attachment and garnishment.  The part of the order granting Knightsbridge's motion to intervene in this action is not affected.

[13] This order does not affect the status of either the Rule B attachment obtained by Intervening Plaintiff ThyssenKrupp with respect to property aboard the M/V SANKO MINERAL allegedly belonging to WBC or the warrants issued pursuant to Supplemental Admiralty Rule C for the arrest of the M/V SANKO MINERAL *in rem*, as those matters are beyond the scope of WBC's motion.  However, the arresting parties, including ThyssenKrupp, have informed the Court, informally, that they intend to move for the voluntary vacatur of these encumbrances if and when the Court vacates the Rule B attachments of Liquimar and Knightsbridge.

(5) Upon a finding by the undersigned that this order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and that "an immediate appeal from the order may materially advance the ultimate termination of the litigation," this order is CERTIFIED FOR INTERLOCUTORY APPEAL.  28 U.S.C. § 1292(b).

Dated this 27th day of July, 2012

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge